### Ramon MONTOYA, Petitioner–Appellant,

### v.

### James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.

### No. 90–7093.

United States Court of Appeals, Fifth Circuit.

Feb. 24, 1992.

Rehearing and Rehearing En Banc Denied March 24, 1992.

K. Duff Lewis, Washington, D.C. (Court-appointed), for petitioner-appellant.

Margaret Portman Griffey, Jim Mattox, Atty. Gen., Austin, Tex., for respondent-appellee.

Before POLITZ, Chief Judge, JOLLY and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Petitioner Ramon Montoya was convicted of capital murder after a jury trial in the 282nd Judicial District Court of Dallas County, Texas, and sentenced to death on May 5, 1983. He appealed to the Texas Court of Criminal Appeals, which affirmed his conviction on February 18, 1987, and denied his motion for rehearing on October 28, 1987. *Montoya v. State*, 744 S.W.2d 15 (Tex.Crim.App.1987), *cert. denied*, 487 U.S. 1227, 108 S.Ct. 2887, 101 L.Ed.2d 921 (1988). After exhausting his post-conviction remedies in state court, Montoya filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Northern District of Texas. The district court denied relief but issued a certificate of probable cause. Montoya appeals, and we affirm.

The Court of Criminal Appeals set out the facts of this case in its original opinion:

The testimony revealed that Officer John Pasco of the Dallas Police Department was shot and killed while trying to apprehend appellant. On January 16, 1983, at approximately 4:00 p.m., appellant and others were drinking beer in the vicinity of 1800 Park in the City of Dallas. When Pasco arrived, appellant began to move away from the group of people. Then Pasco began to pursue appellant individually, and appellant started to run. Pasco chased him. Appellant testified that while Pasco was chasing him, he attempted to remove a pistol from his waistband and throw it away so Pasco would not catch him with it. The weapon discharged and Pasco, who according to appellant had grabbed appellant's arm, was shot in the head. He died a few hours later.

Officer Jerry Loudermilk testified that, while on patrol duty, he received a call from Officer Pasco to "cover" him. When Loudermilk arrived at the scene, he saw that Pasco had been shot. Several other Dallas police officers were already at the scene: trying to help Pasco and interviewing witnesses. Loudermilk was informed that there was no description yet of the suspect.

Loudermilk returned to his patrol car and began to search the immediate area. While searching, he received information by radio describing the suspect as a short Latin male with a tattoo of a panther on his chest. He continued to search until 6:05 p.m. when he saw the appellant and stopped to talk to him "just for information." At the time, Officer Loudermilk "didn't have any idea" that the appellant was a suspect in the shooting. When Officer Loudermilk stepped out of his car and spoke in Spanish twice to the appellant, the appellant said nothing in response, but turned and started to run away. Officer Loudermilk pursued and detained the appellant. Loudermilk then lifted up the appellant's shirt, and saw the tattoo of a panther on the appellant's chest. He asked the appellant his name. After the appellant responded, Loudermilk placed him under arrest.

A subsequent search of appellant's home uncovered a .25 caliber automatic pistol. Ballistics determined it to be the weapon that fired the fatal shot.

744 S.W.2d at 18 (footnote omitted).

After Montoya was arrested, he was taken before a magistrate and arraigned on the charge of attempted murder of a police officer. Officer Pasco died that evening, and Montoya was presented to a magistrate on the new charge of capital murder the following morning. Montoya was subsequently taken to the Dallas Police Department and questioned. After waiving his rights, he executed a written confession in Spanish. Translated, it stated:

Yesterday, January 16, 1983, I was at a parking lot of some apartments at Hickory and Park. A policeman arrived. He was a patrolman, and he got out of the patrol car. I was going to leave, and he pointed the pistol and said something to me. I was running from the policeman. He chased me through the alley. He was getting closer, and I had the pistol in my right hand. I had the pistol from the time he started chasing me. When the policeman was about to catch me, he pushed me, and I fell on my back. I pointed the pistol at him and shot the policeman. I pointed at his chest when I fired. The policeman fell to the side of me. I got up and ran. I threw the pistol. I ran to my apartment and changed pants.

At the same time, Montoya consented to a search of his apartment, which revealed the murder weapon.

From the seventeen points of error he argued before the Texas Court of Criminal Appeals and the twenty grounds for relief he alleged in the district court, Montoya has distilled the challenge to his conviction and sentence to three arguments. We examine each of them in turn and find none meritorious.

I.

Montoya argues first that his interrogation by the Dallas Police Department vio-

lated his right to counsel under the Sixth Amendment and the prophylactic rule of *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). The state counters that *Jackson* does not apply to the facts of this case and that Montoya validly waived his right to counsel pursuant to *Patterson v. Illinois*, 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988). The district court concluded that the interrogation did not violate Montoya's constitutional rights. We agree with the district court.

▇▇▇ When Montoya was taken before the magistrate, his Sixth Amendment rights attached. *See Jackson*, 475 U.S. at 629–30, 106 S.Ct. at 1407–08. Standing alone, however, the mere *attachment* of a defendant's Sixth Amendment rights does not bar police from attempting to interrogate him. *See Patterson*, 487 U.S. at 290, 108 S.Ct. at 2394 (rejecting petitioner's claim that "because his Sixth Amendment right to counsel arose with his indictment, the police were thereafter barred from initiating a meeting with him"). As long as the police administer *Miranda* warnings before proceeding, a defendant's voluntary decision to answer questions without claiming his right to have a lawyer present to advise him constitutes a "knowing and intelligent," and therefore valid, waiver of his Sixth Amendment right. · *Id.* at 292–97, 108 S.Ct. at 2394–97. The district court found that "Montoya was fully advised of his rights under *Miranda v. Arizona*, and that he did not thereafter request appointment of counsel and proceeded to make the statement at issue." Thus, Montoya validly waived any Sixth Amendment right to

counsel that arose merely from his appearance before the magistrate.

▇▇▇ If the police-initiated interrogation did not violate the Sixth Amendment itself, argues Montoya, it at least violated the rule laid down in *Michigan v. Jackson*. There the Supreme Court held: "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." 475 U.S. at 636, 106 S.Ct. at 1411. It is undisputed that during Montoya's appearance before the magistrate, the magistrate appointed counsel to represent Montoya. On direct review, the Texas Court of Criminal Appeals considered the conflicting trial testimony and concluded:

> [T]he record indicates the appellant did not request counsel.... The magistrate stated that he decided to appoint counsel to represent appellant because the appellant was charged with capital murder, not because the appellant requested the assistance of counsel.
>
> ... We hold that appellant did not assert his right to counsel at the [magistrate's] hearing.

*Montoya*, 744 S.W.2d at 26. Montoya's brief yields no reason to disturb the presumption of correctness accorded this finding by 28 U.S.C. § 2254(d).[1]

The rule of *Jackson* is invoked by the defendant's "assertion ... of the right to counsel." This language connotes an actual, positive statement or affirmation of the right to counsel. At no time did Montoya make such a statement or affirmation—as the state court found, he did not request counsel, and he said nothing at all when the magistrate appointed counsel for him.[2] We

---

**1.** On this point, Montoya's brief states only that at his appearance before the magistrate, "the defendant either asked for counsel or was told that counsel would be appointed to represent him (the witnesses called at the suppression hearing differed on this point)." We note that appellate review may constitute a "hearing" under § 2254(d). *Sumner v. Mata*, 449 U.S. 539, 545–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

**2.** The Court of Criminal Appeals gave credence to the testimony of Officer Lawrence Cadena,

who translated for Montoya at the magistrate's hearing:

> Q. (State): Did you have any problem communicating with [Montoya] in Spanish?
> A. None whatsoever.
> Q. Was there any conversation about whether or not he could afford a lawyer or wanted a lawyer appointed?
> A. I asked him if he had an attorney and he said he did not. At that point ... Judge Middleton stated that he would appoint an attorney for him.
> Q. Judge Middleton said that in English.

do not say that by his silence Montoya "waived" any of his rights, for at any time subsequent to his appearance before the magistrate, including during his interrogation, Montoya could have asked to see a lawyer and *Jackson* would have barred any further police-initiated interrogation. Rather, Montoya never asserted, or invoked, his right to counsel in the first place. *Cf. Smith v. Illinois*, 469 U.S. 91, 98, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (per curiam) ("Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."). For purposes of *Jackson*, an "assertion" means some kind of positive statement or other action that informs a reasonable person of the defendant's "desire to deal with the police only through counsel." *Jackson*, 475 U.S. at 626, 106 S.Ct. at 1405 (quoting *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981)). This holding does not require a defendant to utter the magic words, "I want a lawyer," in order to assert his right to counsel. As Montoya points out, the Supreme Court "give[s] a broad, rather than a narrow, interpretation, to a defendant's request for counsel." *Connecticut v. Barrett*, 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). But interpretation, whether broad or narrow, is only required when there is a "request" or an "assertion" in the first place.

Montoya's argument would in our view extend the prophylactic rule of *Jackson* to situations where the magistrate tells the defendant that he is appointing counsel for the defendant and the defendant does not reject the appointment but also does not seek to consult with counsel. He proffers snippets from three opinions, two by the Supreme Court and one by the Seventh Circuit, in support of this proposed extension. In *Patterson v. Illinois*, the Su-

preme Court held that although the defendant "had the right to have the assistance of counsel at his postindictment interviews with law enforcement authorities," *Jackson* did not apply because the defendant "at no time sought to exercise his right to have counsel present." 487 U.S. at 290, 108 S.Ct. at 2393–94. The Court noted "as a matter of some significance that [the defendant] had not retained, *or accepted by appointment*, a lawyer to represent him at the time he was questioned by authorities." *Id.* n. 3 (emphasis added). Because Montoya assertedly had "accepted" a lawyer by appointment, he argues by negative implication that *Jackson* does apply to his case.

We disagree for three reasons. First, *Patterson* does not further Montoya's case. The footnoted language immediately following the quotation makes clear that *retention* or *acceptance* of a lawyer gives rise to the substantive Sixth Amendment safeguards of *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985), but it does not speak to the initial question what constitutes acceptance of or invocation of the right to counsel. On this point, *Patterson* said that *Jackson* applies when a defendant has "indicated he wanted the assistance of counsel," and *Patterson* characterized the "essence" of *Jackson* as "[p]reserving the integrity of an accused's choice to communicate with police only through counsel." 487 U.S. at 291, 108 S.Ct. at 2394 (emphases added). If the rule of *Jackson* is invoked by a defendant's "indicating" his "choice," then it makes little sense to apply the rule to this case, where Montoya indicated nothing, expressed no choices, and made not the slightest response to the magistrate's intention to appoint a lawyer for him.

A. That's correct.

Q. Did you translate that in Spanish for the Defendant?

A. Yes, I did.

Q. Did you tell him the Judge says he will appoint an attorney for him or what did you tell him?

A. That's exactly what I said. The Judge says he'll appoint an attorney for you.

Q. Did Ramon Montoya respond to that?

A. He did not say anything.

Q. Was there any more conversation after that?

A. No, sir.

744 S.W.2d at 26.

Montoya also points to *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293 (1990), in which the Court stated: "To be sure, once a defendant obtains or even requests counsel as respondent had here, analysis of the waiver issue changes. But that change is due to the protective rule we created in *Jackson....*" This language does not help Montoya. It is reasonably construed to refer to situations where a defendant "obtains" counsel after, and because, he "requests" counsel. Indeed, this is precisely what happened in *Harvey* itself.[3] Montoya, of course, never requested counsel at any time.

Third, the inevitable consequence of Montoya's argument would equate the extent of Sixth Amendment protection with the prophylactic rule of *Jackson*, for he argues that his *Jackson* right took effect essentially when his right to counsel arose, i.e., at the arraignment for capital murder, even though Montoya stood mute on the matter of appointment. The Supreme Court rejected a similar argument in *Patterson*, observing that "the analysis in *Jackson* is rendered wholly unnecessary if petitioner's position is correct." *Patterson*, 487 U.S. at 290, 108 S.Ct. at 2394. To the extent that Montoya seeks an extension of *Jackson* in this manner, he would be urging a "new rule" of constitutional law

within the purview of *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), a rule which would be inapplicable to Montoya's habeas petition. We see no reason why either of the exceptions to *Teague* would apply here.[4]

Finally, Montoya quotes an excerpt from *United States v. Rodriguez*, 888 F.2d 519, 526 (7th Cir.1989), in which the court identified a possible *Jackson* violation:

When a person appears before a judicial officer and emerges with a lawyer, it is a fair inference that he asked for counsel, thus asserting his Sixth Amendment right. Maybe the transcript will show otherwise, but the prosecutor—whose burden it is to demonstrate the waiver of constitutional rights—must establish that by evidence. Silence in the record is not enough to support, let alone to compel, an inference that Rodriguez did not invoke his right to counsel.[5]

It is obvious that this passage offers no aid and comfort to Montoya. In the situation described, it is only a "fair inference," not a certainty, that a defendant has requested counsel, and the court cautions, "[m]aybe the transcript will show otherwise." There is much more than "silence" in this record—there is the live testimony of the police officer who translated for Montoya

---

**3.** *See People v. Harvey*, No. 96420 (Mich.Ct.App. May 18, 1988) (per curiam) (emphasis added), *reprinted in* Petition for a Writ of Certiorari, Appendix A at 3a, *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990):

After defendant was arrested he made a statement to the police at 8:50 a.m. on July 2, 1986, apparently before he was arraigned. The statement was recorded by a police officer and does not indicate whether defendant was advised of or waived his [*Miranda* rights]. While defendant signed the first page of the three-page statement, he refused to sign the last two pages because the officer "wrote some stuff he didn't like[—]something that wasn't pertaining to what happened." *Defendant then asked for an attorney.*

Defendant was arraigned [the same day], and counsel was appointed. On September 9, 1986, six days before trial, [the *Jackson* violation occurred].

**4.** *Teague* held that a habeas petitioner is not entitled to relief based on a "new" constitutional rules deduced after his conviction became final if a state court's rejection of his claim was based on a "reasonable", "good faith" interpretation of

constitutional law at the time of state court review. *See Butler v. McKellar*, 494 U.S. 407, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). *Teague* admits of only two exceptions: if the "new rule" placed certain types of conduct or individuals beyond the state's power to proscribe or punish, or if the "new rule" embraces a bedrock rule of criminal procedure necessary to assure an accurate conviction. *Teague*, 489 U.S. at 312, 109 S.Ct. at 1076. Neither exception applies to this case.

**5.** The court was responding to the argument of the prosecutor that although the magistrate did appoint counsel for Rodriguez, "Rodriguez did not 'invoke' his right to counsel at his appearance [before the magistrate]." *Id.* at 525. The court declined to resolve this "contested issue" and remanded for findings by the district court. The passage quoted in the text follows the court's admonition that even "[i]f we had the power to find facts, we could not accept the prosecutor's argument *on the existing record.*" *Id.* (emphasis added).

at his appearance before the magistrate. *See* note 2, *supra.* The Texas Court of Criminal Appeals credited this testimony and found that Montoya "did not assert his right to counsel at the [magistrate's] hearing." *Montoya,* 744 S.W.2d at 26. The prosecutor has met his burden of establishing by evidence that Montoya did not assert his right to counsel within the meaning of *Jackson.* We reject Montoya's first argument.

## II.

■] At trial, Montoya requested that the jury be instructed on the lesser included offenses of murder, involuntary manslaughter, and criminally negligent homicide. The trial court granted the request only as to criminally negligent homicide. Montoya argues that the court erred in not instructing the jury on the offense of involuntary manslaughter. Because his brief to this court does not cite *Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), it is unclear whether he urges this error as a matter of constitutional or state law. We could not, of course, grant federal habeas relief solely for a violation of state law. The uncertainty is compounded here because *Beck*'s principal concern, that a state should not give the jury the options of death or acquittal when the defendant might be guilty of a lesser offense, is absent from this case. *Id.* at 642–43, 100 S.Ct. at 2392; *Hopper v. Evans,* 456 U.S. 605, 609, 102 S.Ct. 2049, 2052, 72 L.Ed.2d

367 (1982). Montoya's jury had the option of finding criminally negligent homicide.

The Supreme Courts' recent decision in *Schad v. Arizona,* — U.S. —, 111 S.Ct. 2491, 2504–05, 115 L.Ed.2d 555 (1991) convinces us, at any rate, that Montoya cannot state a *Beck* claim. In *Schad,* the capital defendant contended unsuccessfully that although the jury had the options of convicting him for capital murder or second-degree murder, he was constitutionally entitled to an additional instruction on the lesser offense of robbery. *Schad* dispatched this argument by stating:

> The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

111 S.Ct. at 2505. In this case, any conceivable *Beck* problems [6] was removed by a lesser-included offense instruction of negligent homicide. Montoya does not suggest that negligent homicide was unsupported by the evidence, *compare Schad,* 111 S.Ct. at 2505; that option presented a realistic alternative verdict for the jury.

By contrast, the opinion of the Texas Court of Criminal Appeals carefully explained why the facts related by Montoya at trial could not have raised a possibility of involuntary manslaughter under Texas law. *Montoya,* 744 S.W.2d at 29. Montoya's version of events described an accidental shooting rather than an event in which he knew he had created a risk and consciously disregarded it.[7] Thus, even if a

---

**6.** Having resolved this issue based on *Schad* and the inapplicability of the state law urged by Montoya, we do not reach the state's contention that would distinguish *Cordova v. Lynaugh,* 838 F.2d 764 (5th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 932 (1980), and would hold that the Texas death penalty scheme does not in this case raise any *Beck* issue.

**7.** On direct review, the Texas Court of Criminal Appeals explained the applicable state law:
> The difference between criminally negligent homicide and involuntary manslaughter is the culpable mental state required to prove each offense—criminal negligence for the former and recklessness for the latter. Criminal negligence involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results there-

of. On the other hand, reckless conduct involves conscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct. In contrast, the key to criminal negligence is found in whether the actor failed to perceive the risk.
*Id.* at 29 (citations omitted). Thus, to convict Montoya of involuntary manslaughter, the jury would have to find that he "recklessly" caused the death of Officer Pasco. *See* Tex.Pen.Code § 19.05(a)(1). It would have to find that Montoya was aware of a "substantial and unjustifiable" risk that withdrawing the pistol from his pants at the time he did so could result in the officer's death, and that he consciously disregarded that risk. *See id.* § 6.03(c).

second alternative lesser-included offense instruction were constitutionally mandated, it could not have been an instruction on involuntary manslaughter, for no rational juror, given all the facts, could have acquitted Montoya of capital murder and convicted him of involuntary manslaughter under Texas law. *See Hill v. Black,* 932 F.2d 369, 374 (5th Cir.1991).

### III.

At the punishment phase of his trial, Montoya objected to a remark of the prosecutor as an impermissible comment on the exercise of his right not to testify, in violation of the Fifth Amendment. The Texas Court of Criminal Appeals originally held that the comment "did not directly or clearly refer to [Montoya's] silence," *Montoya,* 744 S.W.2d at 32, but on Montoya's motion for rehearing, it "agree[d] with appellant's assessment of the prosecutor's comment," *id.* at 34. The court concluded, however, that the error was harmless beyond a reasonable doubt. *Id.* at 38–40. The district court held that no Fifth Amendment violation had occurred and that if one had, it was harmless beyond a reasonable doubt. Montoya argues that the district court impermissibly refused to accord the "factual finding" of the Court of Criminal Appeals the presumption of correctness mandated by 28 U.S.C. § 2254(d). He also argues that the prosecutor's comment was not harmless error.

 Section 2254(d) does not require deference to the Court of Criminal Appeals on

this issue. The presumption of correctness applies only to "a determination ... of a factual issue." The state court's holding that the prosecutor's comment violated the Fifth Amendment is "a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case" and is therefore "open to review on collateral attack in federal court." *Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980). *See Bertolotti v. Dugger,* 883 F.2d 1503, 1523, 1524 (11th Cir.1989) (decision of Florida court that prosecutor's remark was "a comment on the defendant's exercise of his right to remain silent" constituted "a non-binding opinion on a mixed question of law and fact"), *cert. denied,* ── U.S. ──, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990). Accordingly, the merits of Montoya's Fifth Amendment issue must be addressed.

 A statement violates the Fifth Amendment if "the prosecutor intended to comment on [the defendant's] failure to testify or [if] a jury would naturally and necessarily interpret the prosecutor's remarks in that light." *Brock v. McCotter,* 781 F.2d 1152, 1159 (5th Cir.), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986). Resolution of this issue depends heavily on the context in which the prosecutor's remark was made. *Id.* We quote in the margin the full statements of counsel and court.[8] Viewing the prosecutor's statement in the larger context of his arguments both before the exchange and

---

However, the evidence at trial did not explicitly or implicitly establish that the appellant knew there was a risk to the police officer, and then consciously disregarded that risk. His testimony at trial did not show that the gun was cocked or that he pointed the gun at the officer or in the officer's general direction. The evidence did not show that he threw the gun at the officer. This is not a case like *Simpkins v. State,* 590 S.W.2d 129 (Tex.Cr.App.1979), where the defendant pointed a loaded gun at his victim and consciously disregarded the risk to the victim. This is a case where there was no evidence that the gun was used, or exhibited, in a threatening manner against the police officer. The evidence at trial did not raise the issue of reckless conduct and did not indicate that if the appellant was guilty, he was guilty only of involuntary manslaughter.

*Montoya,* 744 S.W.2d at 29.

8. Mr. Banks is the prosecutor and Mr. Parks the defense counsel:

MR. BANKS: What do we hear from this man over here that it couldn't be deliberately, all my prior conduct, all these past actions, that the man that I am is not such that I'm going to commit acts of violence in the future and I did it?

MR. PARKS: I object to a comment on this Defendant's failure to testify in the second phase of the trial.

THE COURT: Sustained.

MR. PARKS: Ask the jury be instructed to disregard.

MR. BANKS: I hadn't finished the statement at that time.

THE COURT: All right. Let Mr. Banks finish the statement then I'll permit you to finish your objection.

after Montoya had interrupted to object, it appears that he did not intend to comment on Montoya's failure to testify at the punishment phase.

Montoya's closing argument centered on how the jury should respond to Special Issue No. 1, which asked: "Do you find from the evidence beyond a reasonable doubt that the conduct of the defendant, Ramon Montoya, ... was committed deliberately ...?" *See* Tex.Crim.Proc.Code art. 37.071(b)(1). The prosecutor began his rebuttal by arguing that a finding of deliberateness was consistent with Montoya's violent character, as evidenced by his prior convictions for burglary and weapons possession. He then asked: "How else do you prove how somebody acts deliberately and what kind of man they really are? By his reputation.... Mr. Parks didn't talk to you about that but let's go through them." The prosecutor then nine times cited the testimony of witnesses who said Montoya had a "bad" reputation for being peaceful and law-abiding. After each citation, he emphasized that Montoya did not challenge the witnesses on cross-examination. "No questions," he repeated each time.

Finally, the prosecutor asked another rhetorical question: "What do we hear from this man over here that [the shooting] couldn't be [done] deliberately, [given] all my prior conduct, all these past actions ...?" He then answered himself: "[I]f he wanted to call [his father and cousins] or anyone else as witnesses to testify that he had a good reputation, they could have done that and we did not hear from those witnesses." Furthermore, he pointed out, Montoya had not presented any testimony "from his family, a friend, an employer, a neighbor.... How about a preacher, or a priest or a minister. A chaplain, how about anybody to come down and say anything good about the Defendant." The logic of the prosecutor's argument is apparent: the state called many witnesses to establish Montoya's bad reputation; Montoya did not cross-examine them; he called no witnesses of his own to contradict the state's evidence; therefore, the evidence is overwhelming in the state's favor.

Viewed in this context, the prosecutor's challenged remark was intended to be a "comment on the failure of the *defense*, as opposed to the *defendant*, to counter or explain the testimony presented or evidence introduced." This kind of comment "is not an infringement of the defendant's fifth amendment privilege." *United States v. Becker*, 569 F.2d 951, 965 (5th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). Reasonable jurors could interpret the prosecutor's remark in the same manner as have we. Thus, having been instructed that it was "not to consider, discuss or even refer to the choice on the part of the defendant not to testify," the jury would not "naturally and *necessarily*" interpret the challenged remark as a comment on the defendant's failure to testify.

█ Even if the prosecutor's allusion directly implicated Montoya's failure to testify at the punishment phase, the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). It represented an isolated comment in a sea of evidence incriminating Montoya as a vio-

---

MR. BANKS: We know this man's father and cousins were in Dallas, Texas in 1983, in January of this year and if he wanted to call them or anyone else as witnesses to testify that he had a good reputation they could have done that and we did not hear from those witnesses. That's my entire statement.

MR. PARKS: I want the record to reflect when Mr. Banks was stating the words to the effect that he has not, whatever those exact words were, he was pointing directly at Mr. Montoya as he said those words and that he had finished his statement when I made my objection.

THE COURT: Well, the record may reflect that he gestured toward the Defendant. The record will speak for itself whether or not he finished the statement. In an abundance of caution I want to sustain your objection. I already have.

MR. PARKS: I respectfully move for a mistrial.

THE COURT: That's denied.

MR. BANKS: Well, you haven't heard from his family, a friend, an employer, a neighbor. Well, you've heard from the neighbors. How about a preacher, or a priest or a minister. A chaplain, how about anybody to come down and say anything good about the Defendant. [TRANSCRIPT at 3180–82]

lent and erratic man. The state produced over a dozen witnesses who testified to his bad reputation with regard to peacefulness and lawful conduct. Witnesses also described numerous threats of violence by Montoya, including some directed at the police, his intimidating exhibition of knives, and his beating of women. Prior convictions for burglary and unlawfully carrying a weapon were introduced. Montoya offered no evidence at all in rebuttal. The case for his future dangerousness stood unanswered and amply documented. The district court correctly refused to grant habeas relief for this one prosecutorial comment on the evidence.

Finding no constitutional errors in either Montoya's conviction or his sentence, we affirm the judgment of the district court and deny the petition for writ of habeas corpus.

AFFIRMED.