# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00868-COA

**JOSHUA FLETCHER**      **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**      **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/21/2021 |
| TRIAL JUDGE: | HON. JOHN KELLY LUTHER |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/05/2024 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. Joshua Fletcher was tried and convicted in the Circuit Court of Marshall County, Mississippi, of capital murder and was sentenced as a habitual offender pursuant to Mississippi Code Annotated section 99-19-81 (Rev. 2014), to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections, without eligibility for parole. Aggrieved, he appealed.

## FACTS AND PROCEDURAL HISTORY

¶2. In late July 2017, Samuel Deward Smith left Louisiana in his Chevrolet pickup truck with his dog, Khava, and headed to North Carolina. Smith was carrying camping gear in the

back of his truck and planned on sleeping outdoors along the way. At the beginning of his trip, Smith picked up Fletcher, who was walking down the side of the road. Smith and Fletcher then traveled together into Mississippi and stopped at a Circle K gas station in Senatobia to ask for directions to Chewalla Lake.

¶3. On the morning of July 26, 2017, around 6 a.m., Robert Anderson saw Smith and Fletcher sleeping near a boat ramp on Chewalla Lake. A few hours later, when Anderson had finished fishing, he saw the two men again and had a short conversation with Smith. Sammie Charles Whaley, who worked on a Marshall County road and bridge crew, testified that between 8 and 9:30 a.m. on that same day, Fletcher approached his crew on a road near the lake and asked for directions to the interstate. Fletcher was driving Smith's truck at the time; however, Smith was not in the vehicle with him. The road crew noted that Fletcher's behavior was odd. Fletcher was soaking wet and was covered in grass and mud. Shortly thereafter, Fletcher was identified on surveillance video inside Lake Central General Store again asking for directions. Smith was not seen in the store surveillance footage.[1]

¶4. Three days later, on July 29, 2017, Smith's body was discovered by a father and son fishing at Chewalla Lake. Smith's body was found under a large tree root in a shallow part of the lake. A newspaper from Alexandria, Louisiana, and a pocket knife with a broken blade were found in the grass near Smith's body. Smith's dog was recovered by the Montgomery County Sheriff's Department on August 14, and Smith's truck was recovered

---

[1] Investigators did not know Fletcher's identity initially. They published the surveillance video on social media. A month after the murder, investigators from Grant Parish, Louisiana, identified Fletcher and contacted Marshall County law enforcement.

in Canton, Mississippi, also on August 14.

¶5.    Fletcher turned himself in at the Humphreys County Sheriff's Department on October 27, 2017.  When the receptionist asked Fletcher why he was "wanted," Fletcher told her, "[Y]ou just run me on the computer and you'll find out why I'm wanted."[2]  The sheriff's department discovered that Fletcher was wanted in Marshall County as a suspect in Smith's death.  On October 28, 2017, Fletcher was transported from Humphreys County to Marshall County and was interviewed by Marshall County Investigator Kelly McMillen and Sheriff Kenneth Dickerson.  During this interview, Fletcher admitted that he killed Smith. Fletcher was later interviewed by Grant Parish, Louisiana Sheriff's Office investigators Brad Sudduth and Ryan James in Marshall County on October 31, 2017. The Louisiana investigators were interviewing Fletcher concerning a burglary that occurred in Louisiana; however, during the interview, Fletcher again confessed to the murder of Smith.

¶6.    A Marshall County grand jury indicted Fletcher for the capital murder of Smith, as a habitual offender. Prior to trial, Fletcher filed a motion to exclude and suppress the statements he gave to law enforcement.[3] At the suppression hearing on May 17, 2021, the court heard testimony from all four officers involved in the interviews, listened to the recordings of the interviews, and heard the arguments of counsel. At the conclusion of the

---

[2] Fletcher would later tell law enforcement that at the time, he thought he was "wanted" for a parole violation in Louisiana.

[3] Fletcher's written motion to suppress did not include his contention that he had invoked his right to counsel during the interview. The record at the beginning of the suppression hearing, however, makes it clear that Fletcher's counsel had orally raised this issue before the hearing began.

hearing, the court found that Fletcher had been properly advised of his rights and that he had knowingly, intelligently, and voluntarily waived those rights and therefore, his statements to both Mississippi and Louisiana officers were voluntarily given. However, the court took two issues under advisement and invited briefs on those points. First, concerning the interview with Mississippi officials, the trial court left open the issue of whether Fletcher's statement concerning getting an attorney was sufficient to require the interview to stop. Second, if the court were to find that Fletcher's statement to the Mississippi officials was sufficient to require the questioning to stop, the trial court left open the issue as to the effect it would have upon Fletcher's statement to Louisiana officials. Prior to the beginning of trial on July 19, 2021, the trial court denied Fletcher's motion to suppress. Fletcher was tried on July 19-21, 2021, and convicted of capital murder. Fletcher was sentenced as a habitual offender to serve a term of life imprisonment without eligibility for parole. After his post-trial motions were denied, Fletcher appealed.

**STANDARD OF REVIEW**

¶7.     Whether a confession is admissible is a finding of fact. *Hunt v. State*, 687 So. 2d 1154, 1159 (Miss. 1996) (citing *Lee v. State*, 631 So. 2d 824, 826 (Miss. 1994)). "[U]nless the [circuit court] applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence," the circuit court's determination will not be disturbed. *Id*. "Once a [circuit court] determines admissibility, the defendant/appellant faces a heavy burden in trying to reverse on appeal." *Ruffin v. State*, 992 So. 2d 1165, 1169 (¶8) (Miss. 2008) (citing *Greenlee v. State*, 725 So. 2d 816, 826 (¶26)

4

(Miss. 1998)).

## ANALYSIS

¶8.    The sole issue presented by Fletcher on appeal is whether the trial court erred when it failed to suppress his statement to law enforcement officials. Fletcher contends that he clearly invoked his right to counsel and that the interview, therefore, should have been discontinued at that point. Fletcher further claims that even if this Court finds that Fletcher's request for counsel was equivocal or ambiguous, the investigators should have ceased any further questioning with the exception of limited questions to attempt to clarify Fletcher's invocation of the right to counsel.

¶9.    In *Chamberlin v. State*, 989 So. 2d 320, 332-33 (¶37) (Miss. 2008), the Mississippi Supreme Court reasoned:

> "Invocation of the *Miranda* right to counsel requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis* [*v. United States*], 512 U.S. [452,] 459, 114 S. Ct. 2350 [(1994)] (citing *McNeil* [*v. Wisconsin*], 501 U.S. [171, 178 (1991))] (internal quotation marks omitted). A defendant must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459, 114 S. Ct. 2350. The Supreme Court explained in *Davis* that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents *do not require the cessation of questioning*." *Id*.

(Emphasis added).

¶10.   After being advised of his *Miranda*[4] rights and signing a waiver indicating that he was

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

5

willing to talk with the investigators, the Marshall County investigators began to question Fletcher about their investigation into Smith's murder. When Fletcher was shown a picture that showed him with Smith's truck, the following exchange occurred:

INVESTIGATOR: This guy right here almost looks like your twin.

FLETCHER: Right, that's what I just wanted to get at. Ok, I see what you are doing. I see what's going on. You know, and I understand it. And *I'll just get a lawyer ok.* Just to settle the dispute between the irony of asking questions ok. Alright and *that's as far as I'm going to go with ya.*

INVESTIGATOR: Ok.

FLETCHER: Cause I need to cool down and get a little rest man, okay and uh . . . .

INVESTIGATOR: I understand.

FLETCHER: You know . . . . Because I don't want you to ask me questions when you feel the way you feel about something. You know, and I feel the way I feel about something.

INVESTIGATOR: What are you talking about?

FLETCHER: Like you know, I'm not understanding. It's making my heart beat fast. You know what I mean?

INVESTIGATOR: Yes sir.

FLETCHER: And I don't really know what the root is and you ain't told me about why I'm getting asked these questions, you know and *that's what I want to know.* Ok?[5]

---

[5]At this point in the interview, investigator McMillen pulled out multiple photographs from his file that had been gathered in the course of his investigation into Smith's death, including pictures of Smith's body at the crime scene. As he laid out the photos, McMillen told Fletcher that those photos were the reason he was asking the questions.

INVESTIGATOR: You want me to show you? Here, let me show you why I'm asking you these questions. I'm a criminal investigator and I investigate criminal activity with violent crimes mainly. Let me show you why I'm asking you the questions. Do you need to see anything else? That's why I'm asking you the questions. Okay?

FLETCHER: Yeah.

INVESTIGATOR: And from where this body is located, this truck was parked.

FLETCHER: Mmm hmm.

INVESTIGATOR: And where that truck was parked, there is a store east of that location where that truck was parked and this guy right here named Joshua Fletcher got out of that truck. And that's my victim's shirt that you had on when you left in his truck. And you stopped and talked to seven different men before you got to that store asking them directions on how to get to the interstate.

FLETCHER: Mmm hmm.

INVESTIGATOR: Okay? And that's why I was asking you the questions.[6] We'll talk when you get . . . .

FLETCHER: This is what I'm going to do . . . . This is what I'm going to tell you. You did your job and I don't want to be beaten up because your anger.

INVESTIGATOR: No, No.

FLETCHER: Let me tell you, you went to college and you did everything and you are complete with your investigation okay and I'm guilty. I'm guilty. Okay. I'm sorry it makes you nervous now. I won't lie to a man, you understand . . . ?

INVESTIGATOR: I understand. . . yes sir.

---

[6] At this point, the investigator was putting the photos back into a file folder.

7

FLETCHER: I don't want to be in here, you know, scared of rumors going around the jail about that or anything.

INVESTIGATOR: You won't have no problems about that my man . . . . You'll be secure.

FLETCHER: My name is Josh Fletcher and I'm guilty and you're complete on your investigation.

INVESTIGATOR: How did it happen?

FLETCHER: And I really can't explain my actions and uh, I was wanting to go home and I was just a poor man and not having nothing. . . . I deserve to be done the same thing that man was done to him and that's what I expect and I know this is the South and I know that's the way it should go and I . . . .

INVESTIGATOR: Just answer two questions and I'll get out of your way. It's just me and you and the Sheriff. How did it happen?

FLETCHER: Pressure . . . not being the place and not doing the thing that I wanted to do with my life that I thought I was capable of being able to do. Being uncomfortable.

INVESTIGATOR: I understand.

FLETCHER: And being with somebody I'm not knowing and trying to adapt to their behavior and to the things that they offered themselves you know to help me with and, you know, like being dirty, my body and being afraid to ask him to bring me all the way back home and just . . . .

INVESTIGATOR: How did you kill him?

FLETCHER: With a rock, I picked up a big rock.

(Emphasis added). Fletcher then gave a detailed account of the events surrounding Smith's death. Near the close of the interview, Fletcher requested a cigarette break. The sheriff and investigator took Fletcher to a holding dock area, and while Fletcher was smoking, he

8

continued to talk about his encounter with Smith in late July 2017. McMillen began to video Fletcher with his cell phone as he continued to talk. The cell phone video was also admitted as an exhibit at trial and is referred to by the trial court as the second interview. Three days later, as noted above, Fletcher was interviewed by law enforcement officials from Grant Parish, Louisiana, and he confessed that he killed Smith. This interview occurred in Marshall County.

¶11.  On the first day of trial, the trial court judge formally denied Fletcher's motion to suppress on the record.[7] The trial court judge held, "I do not think it was an affirmative, unequivocal request for [an] attorney. . . .  It appeared to me to be a request-- acknowledgment that he has a right to an attorney, and at some future time that he would get an attorney. It was not a request. I did not perceive it to be a request for an attorney at that time. And so that's pretty much the issues in the first recorded statement." The judge further held that the cell phone video was merely a continuation of the first interview and the initial *Miranda* warning was sufficient to cover that interview as well. Finally, he held that Fletcher was properly advised of his rights before the interview by Louisiana officials.

¶12.  Fletcher's counsel argued that his statement that "I'll just get a lawyer, ok" and "that's as far as I'm going to go with ya" was an unambiguous invocation of his right to counsel and that questioning by law enforcement should have ceased. While Fletcher's statement indicated that he would get an attorney in the future, the video clearly shows that Fletcher did not stop talking with the investigators. Immediately after mentioning that he would get a

---

[7] There is no written order to deny the motion to suppress in the record on appeal.

lawyer, Fletcher continued the conversation with the investigators by stating, "And I don't really know what the root is and you aint told me about why I'm getting asked these questions, you know and *that's what I want to know*." (Emphasis added). As stated in *Chamberlin*, Fletcher's statements did not unambiguously or unequivocally communicate a desire to remain silent until he had an attorney present.

¶13.    In *Delashmit v. State*, 991 So. 2d 1215, 1221 (¶16) (Miss. 2008), the Mississippi Supreme Court held:

> Delashmit's statement of "I prefer a lawyer" was only an ambiguous mention of possibly speaking with an attorney. . . .  [W]e find that this statement was insufficient to invoke the right to counsel. Clearly, a reasonable police officer would not understand this statement alone to be an unequivocal assertion of the right to counsel.

And in *Jackson v. State*, 299 So. 3d 823, 833 (¶24) (Miss. Ct. App. 2020), this Court held:

> A person does not have to use specific language such as "I want a lawyer" in order to invoke the right to counsel.  *Montoya v. Collins*, 955 F. 2d 279, 283 (5th Cir. 1992). **Only "some kind of positive statement or other action that informs a reasonable person of the defendant's 'desire to deal with the police only through counsel'" is required to assert the right**. *Wilcher v. State*, 697 So. 2d 1087, 1096 (Miss. 1997) (quoting *Montoya*, 955 F. 2d at 283 (quoting *Michigan v. Jackson*, 475 U.S. 625, 626 (1986), *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778,780-81, 797 (2009))).

(Emphasis added).  Further in *Piccaluga v. State*, 337 So. 3d 1142, 1152-53 (¶¶46-47) (Miss. Ct. App. 2021), this Court stated:

> In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court held that a "suspect must unambiguously request counsel" in order to invoke his right to counsel under *Miranda*. *Davis*, 512 U.S. at 459. The Court "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id*. at 461. Instead, the Court held that "officers have no obligation to stop questioning" a suspect until the suspect makes "an unambiguous or unequivocal request for counsel." *Id*. at 462.  In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court

10

extended *Davis*'s holding to a suspect's invocation of the *Miranda* right to remain silent. *Id.* at 381-82.

> In *Moore* [*v. State*, 287 So. 3d 905 (Miss. 2019)], . . . the Mississippi Supreme Court held that officers are permitted to ask questions to "clarify an ambiguous invocation" of the right to remain silent or to counsel. *Moore*, 287 So. 3d at 914 (¶33). But in *Saddler v. State*, 297 So. 3d 234 (Miss. 2020), the Court "held that such clarifying questions are not required." *Id.* at 239 (¶13) (emphasis added). **Therefore, it is now clear, under both the Federal Constitution and the Mississippi Constitution, that officers have no obligation to stop questioning a suspect in the absence of an unambiguous or unequivocal request for an attorney or assertion of the right to remain silent.** *Id.*

(Emphasis added).

¶14. We find that Fletcher did not unambiguously or unequivocally assert his right to counsel or his right to remain silent. Therefore, investigators were under no obligation to stop the interview after Fletcher mentioned getting an attorney. In fact, it was Fletcher who compounded the ambiguity by continuing the conversation with the investigators after he mentioned getting a lawyer. Until Fletcher asked why he was being questioned, the sum total of the investigators' responses to Fletcher were, "Ok. . . . I understand. . . . What are you talking about? . . . Yes sir." Fletcher told the investigators that he wanted to know "why I'm getting asked these questions . . . ." After the investigator laid out the photos from his investigation and explained why he was being questioned, Fletcher confessed to murdering Smith. Therefore, Fletcher's claim in this context that the trial court erred by denying his motion to suppress fails.

## CONCLUSION

¶15. After reviewing the record, we find no error by the trial court. Therefore, Fletcher's

conviction and sentence for capital murder are affirmed.

¶16. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND SMITH, JJ., CONCUR.**