974 So.2d 1238 (2008)
STATE of Louisiana
v.
Jesse Jay MONTEJO.
No. 2006-KA-1807.
Supreme Court of Louisiana.
January 16, 2008.
Rehearing Denied March 7, 2008.
*1240 Capital Appeals Project, Jelpi Pierre Picou, Jr., Aneel Lachman Chablani, Price Quenin, for applicant.
Charles C. Foti, Jr., Attorney General, Walter P. Reed, District Attorney, Kathryn W. Landry, Assistant District Attorney, for appellee.
VICTORY, J.
On October 24, 2002, Jesse Jay Montejo and Jerry Moore were indicted by a grand jury for the first degree murder of Lewis Ferrari, a 61-year-old Slidell man who was found dead by his wife in their kitchen on September 5, 2002.[1] After trial, the jury found Montejo guilty as charged on March 9, 2005. The brief penalty *1241 phase was held on March 10, 2005.[2] After the presentation of evidence, the jury deliberated for approximately three hours before determining that Montejo should be sentenced to death. On May 13, 2005, defendant's motion for new trial was denied,[3] and Montejo, age 26, was sentenced to death for the first degree murder of Lewis Ferrari, which offense was committed during the commission of an armed robbery and an aggravated burglary. Montejo now appeals to this Court, assigning 20 errors.

FACTS AND PROCEDURAL HISTORY
Lewis and Patricia Ferrari operated a family dry-cleaning business with nine stores in St. Tammany Parish and one store in Tangipahoa Parish. At 3:30 p.m. on the Thursday of the murder, Mr. Ferrari left the store where his wife worked and went to the grocery store. When he failed to show up for dinner at a local restaurant at 6:00 p.m., Patricia Ferrari went to their home, where she found the garage door open and Mr. Ferrari's car missing. Upon entering the kitchen, she saw groceries on the counter still in grocery bags and found Mr. Ferrari dead on the floor of the kitchen. Mr. Ferrari had suffered two gunshot wounds, one to the right chest area and one to the right eye. The gunshot wound to the eye was fatal within a matter of seconds.
According to the state, the crime was planned by Moore and perpetrated by Montejo with the assistance of Montejo's 19-year-old step-brother, Eric Gai. At trial, witnesses described the victim as a person who followed a well-known and predictable routine, and who was killed on the day he transported the payroll. The victim's widow described her husband's habits for the jury, including how he transported money, deposits, and checks in the trunk of his vehicle on Thursdays, which was the day he did payroll, and how he could usually be found at home between four to six p.m. Birdie Sue Morrow, who worked as a contract seamstress for the victim, confirmed that the victim paid his employees on Thursdays. Typically on Thursdays, the Ferraris would meet at a local restaurant sometime after 6:00 p.m. for a family dinner.
The victim's adult son, Lewis Ferrari III, testified that Moore was familiar with his father's routines. Several witnesses described Moore's recent association with the defendant and his long-term but rocky relationship with the victim. The victim's widow testified that Moore had performed mechanical work for the family dry cleaning business for about 10 years but that he became unreliable.[4] Lewis F. Ferrari III confirmed that Moore was capable of good electrical work but that he had become very unreliable, and he said that he objected to his father continuing to employ Moore. Both of these witnesses testified that Moore recently lost his driver's license and he had hired Montejo, whom he met while hitchhiking, to transport him. The victim's son described Montejo's car as a blue van with a distinctive chrome cattle guard in the front.
Morrow testified that she saw Moore and the victim argue on two occasions: *1242 once about one month before and again on the day of the murder. On both occasions, she heard the victim tell Moore that he was not afraid of him.[5] She said that Moore left after the most recent argument by entering the passenger side of the blue van that routinely transported him. Hugh Dillard, who owns and operates a poboy shop next to the victim's dry cleaning business, also watched Moore and the victim argue loudly outside his shop on the morning of September 5, 2002.[6]
The victim's widow testified that they lived in a quiet neighborhood on Rue Lamothe in Slidell. Several neighbors noticed Montejo's blue van, with its distinctive chrome cattle bar, in the neighborhood the time of the murder.[7] Stacy Stubbenville, who lived on Rue Lamothe, was driving home at about 4:15 p.m. on the day the victim was murdered when she noticed an unusual blue van with a chrome cattle bar on the front. The van had a driver and a passenger. Larry Landry, another neighbor, also noticed the blue van in the neighborhood at some time between three to five p.m. on the day of the murder. Jo Ann Diaro lived near the Ferraris. On the day of the murder, she arrived home at 5:00 p.m. and left again at 5:30 p.m., when she noticed two vehicles: a blue van (driven by a young white male with brown hair) driving very quickly down the street and the victim's white Lincoln (whose driver she could not see) backing out of the Ferraris' driveway. The two vehicles almost collided when the Lincoln cut off the van and they stopped briefly together before exiting the neighborhood. Finally, Janice Dow, who also lived near the Ferraris, saw the blue van driving very quickly through the neighborhood twice on the day of the murder: once at 4:30 p.m. and again at about 5:30 p.m. with the Ferraries' white Lincoln behind it.
The state presented physical evidence, which included the undisputable presence of Montejo's DNA under the victim's fingernails. Dr. Dudhir Sinha, president and laboratory director of ReliaGene, testified as an expert in molecular biology and DNA analysis that he tested scrapings from beneath the victim's fingernails and a reference sample from the defendant. A scraping from the victim's right hand contained only the victim's DNA; a scraping from the victim's left hand contained a mixture of the victim and defendant's DNA. Dr. Sinha also concluded that the victim intentionally scratched defendant because sample characteristics ruled out DNA transfer by coincidental contact.
The victim's body was examined at the crime scene as well as later autopsied by Dr. Mike Difatta, chief deputy coroner for St. Tammany Parish. Dr. Difatta testified as an expert in forensic pathology that the victim sustained two gunshot wounds: one superficial and one fatal. According to Dr. Difatta, the victim was shot once in close contact in his right side and again in his right eye from a distance of at least three feet.[8] The victim would have died within seconds of the gunshot to his head, which the evidence suggested was fired between *1243 4-5 p.m. Dr. Difatta saw no evidence to suggest that the victim was struck in the head with a blunt object. Dr. Difatta identified state's photographic exhibits 2-11, which were admitted without objection, and projected for use by Dr. Difatta's during the latter part of his testimony.[9]
Sergeant Carl Fullilove testified as an expert ballistics and firearms examiner that he examined a bullet and bullet fragments found at the crime scene but noted that the murder weapon was not found in this case. He said that a single intact bullet was extracted from the wall at the crime scene that was similar to the victim's own revolver ammunition,[10] but without the murder weapon it was only possible to infer that the victim was probably killed by a shot from a revolver. James Folse of the St. Tammany Parish Crime Lab collected forensic evidence at the victim's home. He extracted an intact bullet from the dining room wall and recovered bullet fragments from the living room near and underneath the sofa. He obtained only one useful fingerprint from the victim's residence, which was left by a person who was never identified.[11] Susan Downey of the St. Tammany Parish Crime Lab documented the crime scene at the victim's home. She observed an intact bullet in a door casing that appeared to have been shot through the victim[12] and bullet fragments in the concrete slab beneath the sofa. She testified that the victim's sofa had a bullet hole and the characteristic indentation of a revolver. She described the blood pooling, characterized the blood spatter as "high velocity,"[13] and she saw no signs of struggle but noticed that the bedroom was in disarray. Downey identified 37 photographs of the crime scene, some of which were projected during her testimony, and which were admitted without objection in globo.
Folse also assisted in processing Montejo's van and the victim's Lincoln as well as evidence seized from Gai. He photographed *1244 the Lincoln, which was found in an isolated location and later processed at the crime lab by Sergeant Fullilove. The area near this vehicle was searched but no weapon was found. Sergeant Fullilove testified that he found one identifiable partial palm print on the victim's Lincoln, which belonged to the victim, and that the accelerator pedal of this vehicle tested positive for blood. Inside Montejo's van, Folse found receipts for stereo equipment dated September 6, 2002, $322 in cash,[14] and gloves.[15] No blood was found inside the van or on the defendant's clothing. Detectives delivered a seat cushion to the crime lab that was taken from Gai, which Folse documented, that concealed $832. Folse identified photographs of the victim's car, the area in which it was found, and Montejo's van, which were admitted without objection, and some of which were projected during his testimony.
Montejo was interviewed by police from about 4:30 p.m. until about 11 p.m. on September 6, 2002, and again between approximately 3:00 and 4:00 a.m. on September 7, 2002. The centerpiece of the state's case was approximately four hours of this videotaped police interrogation during which Montejo slowly made increasingly incriminating statements until he finally admitted that he shot the victim who had unexpectedly returned home and interrupted Montejo's burglary.[16] On September 23, 2002, indigent defense counsel moved to suppress these statements contending that they were made involuntarily.[17] At hearings held on April 20 and June 1, 2004, Detective John Morse[18] testified that he first encountered Montejo at the Gretna Police station where Montejo, after being verbally Mirandized, consented to accompany him to the St. Tammany Sheriff's Office Criminal Enforcement Building to be interviewed.[19] In St. Tammany, Montejo was repeatedly Mirandized, signed several rights waivers,[20] and was interrogated by Detective Morse and *1245 Detective Willis Wade Major.[21] Both detectives testified at the suppression hearings[22] that Montejo understood his rights, was not intoxicated, showed no sign of mental defect, was not promised or threatened anything, spoke to them voluntarily, and freely waived his rights.
The videos of the interrogation on September 6, 2002, up until Montejo invoked his right to counsel at about 10 p.m., show the following. The video begins a little before 7 p.m.[23] The defendant was shirtless[24] and smoking[25] as he related his first version of the crime, in which he claimed that his only involvement was in driving Moore to the victim's home and leaving him there without knowing that Moore was going to rob and kill the victim. Confronted with the potential that his DNA might be found inside the home,[26] Montejo related his second version of the crime. He said that the victim was not home when he *1246 arrived at about 5 p.m. with Moore, who told him that they could wait inside. After about 10 minutes, Moore started ransacking the residence, so Montejo left.[27] He became disoriented and was briefly lost in the neighborhood. After he regained his bearings, he saw Moore drive away in the victim's car. Montejo attempted to answer the detectives' follow-up questions, but abandoned this story for a third version, after detectives suggested that Moore would blame Montejo and confronted him with the possibility that the forensic evidence would prove that the victim scratched his neck or that he was present when the murder weapon was fired.[28] In the third version, Montejo did not leave when Moore (who was wearing gloves) ransacked the home. Instead, he and Moore hid when the victim arrived. Moore struck the victim over the back of the head with the gun and Montejo tried to run. The victim turned and flailed wildly, scratching Montejo, and Moore shot the victim, who remained standing. As Montejo fled, he heard a second shot. Montejo became briefly lost in the neighborhood and saw Moore drive away in the victim's car. In response to demands for corroborating physical evidence, such as the location of the murder weapon or any stolen property,[29] and again confronted with forensic evidence,[30] Montejo invoked his right to counsel but quickly retracted his request as follows:
Montejo: "I would like to answer no more questions unless I am in front of a lawyer."
Captain Hall:[31] "Good enough." (exits)
Montejo: "Now, . . . "
Detective Morse:[32] "You are under arrest for first degree murder."[33]
Montejo: ". . . now, I know you aren't that bad a people and all . . . "
(both detectives stand and turn toward exit)
Detective Major: (interrupting) "Dude, you don't want to talk to us no more, *1247 you want a lawyer, right? I trusted you and you let me down."
Montejo: "No, come here, come here."
Detective Major: "No, no, I can't."
Montejo: "No, come here . . . "
Detective Major: "No, you've asked for an attorney, and you are getting your charge. And the shame of it is . . . "
Montejo: "I don't want no attorney."
The video recorder was turned off at this point and did not begin again until approximately 10 minutes later. All detectives testified at the suppression hearings that, after the exchange quoted above, they terminated the interview and left the room. At trial, Detective Major testified that after the tape was turned off, Montejo "started to literally beg us to come back into the room to continue the interview." The detectives then met with their supervisors for ten minutes to determine whether they could legally continue the interview. Detective Major testified that during this time, Montejo "continued to ask us to come back in, come back in." Detective Morse testified that he briefly spoke to Montejo during the unrecorded period to verify that he wished to continue the interview in the absence of legal counsel.[34] The district court reviewed the tapes, found the detectives' testimony credible, and found that Montejo immediately revoked his request for legal counsel.
After Montejo invoked and revoked his right to counsel, defendant was again read his Miranda rights and signed written waivers of those rights. In the video, the detectives confirmed with Montejo, who was visibly upset,[35] that he was not interviewed during the preceding untaped interval and that he understood his rights and wished to continue the interview in the absence of counsel. Montejo then retracted his claims that Moore killed the victim, and told a fourth version of the crime as a botched burglary.[36] He said that Moore persuaded him to burglarize the victim's home, which he believed would be unoccupied, unlocked, and full of money, and that he agreed to do so because his rent was due. However, he found the victim's gun inside the home and, when the victim came home and surprised him, Montejo hit him in the head with the gun, warned him to stay back, fired a warning shot, and when that failed, shot and killed the victim, before firing the weapon into the couch to un-cock it, and throwing the gun in the lake. After detectives confronted him with the fact that two vehicles left the crime scene together, Montejo retracted this story and told a fifth version of the crime, in which he blamed a person he knew only as "D.P.," an African-American male from the Fischer projects, whom he claimed would be impossible to locate. Montejo said he was introduced to D.P. by Moore, who wanted defendant and D.P. to rob the victim. Montejo agreed because his rent was overdue so he met D.P. at the Rally's and they went to the victim's home. After detectives confronted Montejo with the implausibility of this story, they terminated the interview and the video stops. The *1248 defendant was arrested and transported to jail.
Detective Major and Captain Jerry Hall interviewed Montejo about four hours later in the early morning on September 7, 2002, and that interview was also videotaped. During this interview, Montejo told his sixth version of the crime.[37] He said that Gai, who did not know that Montejo planned to burglarize the home because his rent was overdue, dropped him off at the victim's house at about 5:30 p.m. and was instructed to return later. Moore had told Montejo that the house was unlocked, contained a lot of money, and would be unoccupied because the family would be at dinner.[38] Inside the home, Montejo found a gun, which he picked up to use to scare anyone away who might come home. When the victim returned 10 minutes later, Montejo hit him over the head with the gun, which failed to knock him out, and then fired a warning shot that he intended to miss the victim. However, the victim continued to struggle with him so Montejo shot him. Montejo fled in the victim's vehicle, and found Gai and told him to follow him. Montejo threw the gun out of the window into the lake from the Highway 11 bridge, burned the victim's money bag, threw his gloves out of the window on the highway, gave $800 to Gai, gave some money to Moore, and used his share of the money to pay bills.
These videos were played for the jury at trial. The defendant also testified. He testified that he falsely confessed during the videotaped interrogation because he was exhausted and trying to satisfy the detectives. He then told a seventh version of the crime, which was an elaborated variation of the fifth in which D.P. was first introduced.[39] Defendant testified that on Friday of the week before the murder, when he went to pick up money from the victim on behalf of Moore, the victim introduced him to D.P. and suggested they all meet next week to discuss Montejo working as D.P.'s, rather than Moore's, driver. Montejo described D.P. as an African-American male, about 5' 8" tall, with his initials tattooed in an Old English script on his forearms, who lived in the Fischer Projects. Next week, on the day before the murder, the victim told Montejo to come to his house the next day before 6 p.m. The next day, Eric Gai, his stepbrother, dropped him off at the victim's house, and D.P. answered the door. Inside the residence, D.P. displayed a gun, grabbed Montejo, and took his wallet, from which D.P. retrieved Montejo's license, which he scrutinized. D.P. commented that he now knew where Montejo lived, asked him if he had a big mouth, forced him to the floor, placed the gun against his head, threatened to kill or have killed Montejo or a member of Montejo's family, and fired the gun into the couch to intimidate him. The victim then arrived and D.P. instructed Montejo to hide. When the victim entered the kitchen, D.P. hit him, which caused the *1249 victim to fall onto Montejo.[40] The victim turned around and swung at D.P., who fired at him, and the victim then threw his arms up and backed up. D.P. then threatened them both and demanded the victim's "big stash."[41] D.P. took Montejo's wallet again, placed some of the victim's money in it before returning the wallet to Montejo, instructed the victim to give Montejo his car keys,[42] threatened Montejo's family again, told him to leave, and held the gun to the victim's face. As Montejo left, he heard D.P. threaten the victim and the victim assure D.P. that he would cooperate. Montejo closed the door, heard a gunshot, and fled in the victim's car but became temporarily lost. Montejo then found Gai but almost collided with him trying to get his attention. He instructed Gai to follow him and they abandoned the victim's car on a dirt road. Montejo then told Gai what had happened and gave him the money that D.P. put in his wallet. He did not contact the police because he believed D.P.'s threats.[43]
In addition to these seven versions of the crime, the record contains one additional statement by the defendant: a handwritten letter of apology to the victim's widow, which forms the basis of the defendant's second assignment of error. The letter was written by Montejo (with pen and paper provided by detectives) on September 10, 2002, as he sat in the back of a police vehicle during an excursion in which he accompanied detectives to show them where he disposed of the murder weapon[44] and other evidence.[45] According to Detective Hall, he was unaware that the indigent defender board had been appointed to represent the defendant on the morning of September 10,[46] and Montejo was again Mirandized before he agreed to accompany and assist detectives that afternoon.[47] *1250 This letter was ruled admissible after the suppression hearings and was admitted at trial during the testimony of Detective Hall. Prefaced with an expression of remorse and bracketed by calls for forgiveness, Montejo explained in this letter that he only intended to commit a burglary[48] but that when he was unable to frighten the victim with the gun and to escape he fired two shots (the first intended only as a warning shot) before grabbing the victim's car keys and firing the gun into the couch.[49]
As stated above, after trial, the jury found defendant guilty as charged and sentenced him to death. On appeal, we now consider his 20 assignments of error, most of which are treated in an unpublished appendix to this opinion.

*1251 DISCUSSION
Right to counsel: invocation and waiver
Assignment 1. Defendant contends that the district court erred in admitting the two videotaped statements that he made after he requested an attorney. Defendant alleges that detectives responded to his request by becoming upset and berating him for his decision, which the defendant characterizes as a calculated effort by police to provoke a change of heart so that they could continue the interrogation. Defendant concedes that, at the close of the video, he can be heard to say that he does not want an attorney. However, he contends that the state failed to carry its burden of proving that he freely and voluntarily changed his mind under the circumstances, which include the emotional reactions of the detectives that were captured in the video, the existence of 10 unrecorded minutes before the resumption of questioning, and his visibly distraught condition when the recorded interrogation resumed. Defendant characterizes the entire interrogation as coercive, and alleges that he was exhausted and intimidated by the process.[50] Finally, defendant claims that he was compelled to testify at trial to counter these improperly admitted video statements.
The state responds by emphasizing that defendant's immediate change of heart appears on video, and by noting that the district court made factual determinations that: the defendant reinitiated the interview; his request was initially refused by the detectives; and that he persisted in waiving his right to counsel. The state also refers this Court to the video of the defendant's re-Mirandization and his signed waiver form. Alternatively, the state contends that the error in admitting these statements, if any, is harmless in light of the evidence against the defendant, which includes his admission (before requesting an attorney) that he was present at the time of the murder as well as the presence of his DNA under the victim's fingernails.
In Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court found that if a suspect indicates "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." Edwards v. Arizona, 451 U.S. 477, 481-85, 101 S.Ct. 1880, 1883-85, 68 L.Ed.2d 378 (1981), reconfirmed these views and, to lend them substance, held that when an accused either before or during interrogation asks for counsel, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated, custodial interrogation, even if he has been advised of his rights. The accused is not subject to further interrogation by the authorities until counsel is present, unless the accused himself initiates further communication, exchanges, or conversations with the police. Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880. In Minnick v. Mississippi, 498 U.S. 146, 150-53, 111 S.Ct. 486, 490-91, 112 L.Ed.2d 489 (1990), the Court confirmed that the Edwards *1252 rule bars police-initiated interrogation unless the accused has counsel with him at the time of questioning. "Whatever the ambiguities of our earlier cases on this point, we now hold that when counsel is requested, interrogation must cease; and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." Minnick, 498 U.S. at 153, 111 S.Ct. 486.
The requirement that "interrogation must cease" as soon as counsel is requested means what it says, the immediate termination of the interview, even if the request for an attorney occurs in the midst of standard Miranda warnings. See Smith v. Illinois, 469 U.S. 91, 93, 105 S.Ct. 490, 491, 83 L.Ed.2d 488 (1984) (per curiam) (ordering a confession taken in violation of Edwards suppressed where police "[i]nstead of terminating the questioning at th[e point defendant invoked his right to counsel] . . . proceeded to finish reading Smith his Miranda rights and then pressed him again to answer their questions."); see also State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, 763, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997). When a defendant exercises his privilege against self-incrimination the validity of any subsequent waiver depends upon whether police have "scrupulously honored" his right to remain silent. Michigan v. Mosley, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Miranda and Edwards are prophylactic rules designed to protect an accused against the inherently compelling pressures of custodial interrogation, whether by police badgering, overreaching or subtle but repeated efforts to wear down an accused's resistance and make him change his mind. Oregon v. Bradshaw, 462 U.S. 1039, 1044, 103 S.Ct. 2830, 2834, 77 L.Ed.2d 405 (1983); Wyrick v. Fields, 459 U.S. 42, 45-46, 103 S.Ct. 394, 395, 74 L.Ed.2d 214 (1982); Rhode Island v. Innis, 446 U.S. 291, 298-99, 100 S.Ct. 1682, 1688-89, 64 L.Ed.2d 297 (1980).
Louisiana adheres to these principles. When an accused invokes his Miranda right to counsel, the admissibility of a subsequent confession or incriminating statement is determined by a two-step inquiry: did the accused initiate further conversation or communication; and was the purported waiver of counsel knowing and intelligent under the totality of the circumstances. See State v. Abadie, 612 So.2d 1, 5-6 (La.1993), cert. denied, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993); see also La. R.S. 15:452 (no arrestee "shall be subjected to any treatment designed by effect on body or mind to compel a confession of crime."). Whether police have "scrupulously honored" an accused's right to silence is determined on a case-by-case basis under the totality of the circumstances. See State v. Brooks, 505 So.2d 714, 722 (La.1987), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987); State v. Harper, 430 So.2d 627, 633 (La. 1983); State v. Manning, 380 So.2d 46, 50-51 (La.1980). Factors entering into the assessment include who initiates further questioning; whether there has been a substantial time delay between the original request and subsequent interrogation; whether Miranda warnings are given before subsequent questioning; whether signed Miranda waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. Michigan v. Mosley, 423 U.S. at 105, 96 S.Ct. 321; State v. Brooks, supra; State v. Harper, supra.
In Oregon v. Bradshaw, supra, a plurality of the Supreme Court clarified Edwards by offering a two-step inquiry to be used to determine whether a defendant *1253 validly revoked his previous request for counsel, the first step of which is to determine whether the defendant reinitiated communication with police prior to the interrogation resuming. 462 U.S. at 1045-46, 103 S.Ct. 2830. To answer that question, courts must also consider the intertwined questions of whether the interrogation ceased with the defendant's request for counsel and whether his request was scrupulously honored.[51]See Edwards, 451 U.S. at 484-85, 101 S.Ct. 1880; Mosley, 423 U.S. at 102, 96 S.Ct. 321. Although notions of what constitutes an interrogation, when the interrogation stops, and when it begins again, are all susceptible of becoming legal terms of art, the Supreme Court has thus far kept the analysis grounded in plain language and ordinary notions. For example, in Rhode Island v. Innis, the Supreme Court construed interrogation broadly but plainly:
We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the subject, rather than the intent of the police.
Innis, 446 U.S. at 300-01, 100 S.Ct. 1682. Likewise, the Court in Smith v. Illinois applied the requirement that "interrogation must cease" as soon as a suspect asks for an attorney in a manner that suggested it means what it says, i.e., the immediate cessation of the interview, even if the request comes in the middle of Miranda warnings. Smith, 469 U.S. at 93, 105 S.Ct. 490. Finally, in Oregon v. Bradshaw, the plurality[52] defined what might constitute reinitiating interrogation mostly in terms *1254 of what would not be considered a bid to reinitiate the interview:
While we doubt that it would be desirable to build a superstructure of legal refinements around the word "initiate" in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to "initiate" any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which the word was used in Edwards.

Bradshaw, 462 U.S. at 1045, 103 S.Ct. 2830. This Court scrupulously honored these precedents in State v. Koon, supra at 762-63 (finding that, although the error ultimately proved harmless, "[b]ecause defendant did not reinitiate the conversation but instead the interrogation never ended, the oral statements to [the police officers] should have been suppressed."). With the analysis framed according to common conceptions and expectations, the events captured on video in the instant can now be evaluated.
Defendant's unequivocal and unambiguous request for counsel was captured on video. Defendant informed detectives, after being interviewed for several hours, that he did not wish to answer any more questions without a lawyer. His statement was accompanied by equally clear physical signs that he considered the interview to be over (such as putting his watch back on and leaning back from the interviewers), and the detectives reflected their comprehension of his request both verbally and by standing and preparing to exit the room. The state does not argue that this invocation was unclear or misunderstood. However, at the heart of the dispute is the almost immediate reversal that followed the defendant's request for counsel, which is contained in a crucial interchange lasting about 40-45 seconds. As he soon as he was informed that he was under arrest, and as detectives were leaving the room, the defendant called the detectives back and stated that he did not want a lawyer. There is no question that the interview was terminated and the defendant's right to refrain from answering additional questions was scrupulously honored, at least with respect to Captain Hall, who simply stated "Good enough" before leaving the room. However, the defendant, only one second later and in the absence of any obvious cue from detectives, began to speak again. He was interrupted, and in fact never completed his thought, but the gist of what he appears to have tried to convey was a social bid to reconcile with detectives: "Now, [. . .][53] now, I know you aren't that bad a people and all. . . ." Although it could be argued that this statement evinced a willingness and a desire for a generalized discussion about the investigation, as the Bradshaw Court found the question "Well, what is going to happen to me now?" to express such a willingness,[54] *1255 Montejo's statement appears to be more fairly described as reflection about the way the interrogation was conducted, which at least one court has found constitutes a statement relating to routine incidents of the custodial relationship.[55] Before the defendant could complete this statement, in fact after he only managed to get out the first word, Detective Morse also terminated the interview and scrupulously honored the defendant's request, pausing only to inform the defendant that he is under arrest for first degree murder before exiting the room.
Detective Major also interrupted the defendant. However, this detective's response merits close scrutiny because he commented on the defendant's decision to terminate the interview: "Dude, you don't want to talk to us no more, you want a lawyer, right? I trusted you and you let me down." Because this remark was directed at the defendant, it can be considered as more likely to elicit a response than, for example, statements among detectives.[56] However, mitigating against a finding that this detective's statement amounted to the functional equivalent of interrogation is the fact that the statement did not invite a response from the defendant.[57] It is only after Detective Major made this statement that the defendant began pleading with detectives: "No, come here, come here." Likewise, it is only after Detective Major began his next statement (which was unfinished in the video), that the defendant clearly stated that he did not want an attorney (which is the last statement that can be heard before the video abruptly stops). This final unfinished statement by Detective Major was a refusal combined with what remains unknown: "No, you've asked for an attorney, and you are getting your charge. And the shame of it is. . . ." However hectoring Detective Major's tone, his comments are not questions and were not reasonably likely *1256 to elicit an incriminating response. Further, they are not the functional equivalent of express questioning, which "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[58] Also significant is the fact that Detective Major's critical comments were not necessarily themselves unprompted, but were made in response to the defendant's earlier attempt at reconciliation.[59] Finally, the detectives did refuse to continue to speak with Montejo until after they investigated the legality of proceeding.[60]
The totality of the circumstances indicates to us that the interview was properly terminated and the defendant's rights scrupulously honored before his retraction of his request for counsel. We must now move on to the second step of the inquiry and determine whether the defendant validly waived his rights before the resumption of the interrogation.[61] Although the burden on the state of proving waiver is a heavy one,[62] the instant case presents no basis to doubt the district court's conclusion that the defendant knowingly and intelligently waived his rights.
A waiver is valid if it is a knowing and intelligent relinquishment of a known right under the totality of the circumstances, which in turn is determined by "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461 (1937); Edwards v. Arizona, supra; Oregon v. Bradshaw, supra. The courts will indulge every reasonable presumption against a waiver. Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The Supreme Court in Colorado v. Spring delineated a two-part test to be used to determine whether a suspect validly waived his Miranda rights:
First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and *1257 deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.
479 U.S. 564, 573, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (citations omitted). In the instant case, defendant's re-Mirandization and his signing of a written waiver was captured on video. Regarding written waiver, the Supreme Court has noted:
An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.
North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). As noted above, the instant defendant was re-advised of his Miranda rights and he signed a written waiver form, all of which was captured on video, before the interrogation resumed and the defendant made his most incriminating statements.
Nonetheless, defendant argues that his relative youth, the length of the interrogation,[63] his visibly distraught condition at the time he executed the waiver would support a determination that the waiver was invalid. Defendant alleges that he was exhausted, manipulated and deceived, and argues that the missing 10-15 minutes of video prior to his re-Mirandization is highly suspicious.
However, a review of the videos shows that, although the defendant expresses a desire to go home and sleep in his own bed, he was provided with water, food, and cigarettes. Although he is visibly distraught during the re-Mirandization, he does not appear unduly so nor does he appear distracted or unable to focus. His mental capacity is normal and his mental status is not disputed. Although he is a young adult, he is no longer a juvenile and he is familiar with the criminal justice system. In fact, he comments during the interview that he has spoken with detectives in the past and that he is familiar with the process. Regarding the *1258 defendant's claim that he was deceived[64] and his suggestion that undue pressure was brought to bear during the unrecorded interval, the district court, who heard the testimony of all persons involved, explicitly rejected these claims, stating:
The Court is impressed with Officer Morse's testimony. The Court finds that there is no undue pressure being asserted. By observing the first taped segment and the second taped segment it is apparent that no duress or force by exerted upon this defendant.
The determination of a statement's admissibility is within the trial court's discretion, and it should not be disturbed unless it is unsupported by the evidence. State v. Seward, 509 So.2d 413, 417 (La.1987); see also State v. Brooks, 541 So.2d 801 (La. 1989) (trial judge's conclusions on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility should not be overturned on appeal unless they are not supported by the evidence).
In this case, the defendant controlled the pace and scope of his communications with the police about Ferrari's murder by carefully adjusting his story to conform to the evidence revealed by detectives. He demonstrated his understanding of his Miranda rights and his capacity to regard or disregard them of his own volition by invoking his right to the assistance of counsel,[65] which invocation was followed by an immediate retraction. The record otherwise discloses no coercion used by the police to make the defendant change his mind about discussing Ferrari's death and thus fully supports a finding that the defendant made a knowing and voluntary waiver of his Miranda rights. Thus, as we found that the retraction itself was voluntary and unprompted by statements designed to elicit such a response, we also find that the defendant validly waived his Miranda rights before the resumption of the interview. Accordingly, after careful scrutiny, we find that the subsequent recorded statements were properly admitted at trial and that this assignment of error lacks merit.
Assignment 2. Defendant contends that the district court erred in admitting his handwritten letter to the victim's widow, which he wrote in the absence of legal counsel in the late afternoon of September 10. Defendant refers this Court to the minute entries to show that a 72-hour hearing was held on the morning of September 10, 2002, at which time indigent defense counsel was appointed to represent him, and characterizes this hearing as a critical stage in the prosecution after which time no agent of the state was permitted *1259 to communicate with him directly. He further alleges that testimony established that neither he nor the detectives who accompanied him at that time were aware that counsel had been appointed that morning. Under those circumstances, he argues that the state cannot show that he knowingly and intelligently waived his right to counsel before producing the handwritten letter. Finally, the defendant notes that this handwritten letter was of enough significance to be mentioned in the state's opening remarks.
The state responds that the law is not fully settled on the consequences of a 72-hour hearing under our holdings in State v. Hattaway, 621 So.2d 796 (La.1993) and State v. Carter, 94-2859 (La.11/27/95), 664 So.2d 367, and notes further that the defendant only stood in mute acquiescence at this hearing, but argues (assuming that a right to counsel attached at that time) that the defendant validly waived his right to the presence of counsel (after a full Mirandization) prior producing the handwritten letter. In the alternative, the state argues, as in the above assignment of error, that the error, if any, in admitting this statement is harmless in light of the other evidence of the defendant's guilt.
The Sixth Amendment right to counsel does not attach until after the initiation of formal charges attaches at the initiation of adversarial judicial criminal proceedings, United States v. Gouveia, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984), whether by way of formal charge, preliminary hearing, indictment, information or arraignment. Moran v. Burbine, 475 U.S. 412, 431, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986); Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972).
In Hattaway, this Court held that the right to counsel under La. Art. I, Sec. 13, attaches no later than a defendant's initial court appearance or first judicial hearing and thereafter applies only to those pre-trial proceedings which would be considered "critical stages" under the jurisprudence interpreting the Sixth Amendment. Hattaway further held that after the first adverse criminal proceeding and the court's appointment of an attorney, the state cannot obtain a waiver from the accused or otherwise communicate with him with respect to his offense except through counsel. 621 So.2d at 798.
Two years later, this Court decided Carter. In that case, the criminal defendant had appeared in court for an initial appearance, where bond was set and an attorney appointed to represent him. Three days later, the arresting officer met with the defendant in jail, advised him of his rights and asked him if he wanted to make a statement. After signing a form waiving his rights, the defendant made a statement. The trial court denied the defendant's motion to suppress, but this ruling was reversed by the court of appeal based on our holding in Hattaway. State v. Carter, 94-1387 (La.App. 4 Cir. 11/2/94). Upon review, we reconsidered Hattaway and overruled some of its holdings.[66] In particular, we found that Hattaway's holding that right to counsel could not be *1260 waived after counsel had been appointed at the initial hearing was too broad because it was based on United States Supreme Court jurisprudence that dealt only with covert interrogation of a defendant. 664 So.2d at 374.[67] We held that where covert interrogations are not involved, the Supreme Court has never held a defendant may not under any circumstance waive his Sixth Amendment right to counsel. Id. at 376; see Patterson v. Illinois, 487 U.S. 285, 291, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); Michigan v. Harvey, 494 U.S. 344, 352, 110 S.Ct. 1176, 1181, 108 L.Ed.2d 293 (1990). Instead, we recognized that "although the general rule is that a defendant can make a valid waiver of his right to the assistance of counsel during direct or overt interrogation, even in the absence of his counsel, the United States Supreme Court later created a `prophylactic rule' for deciding whether an accused who has `asserted' his Sixth Amendment right to counsel could subsequently be found to have waived that right." Id. at 379. This "prophylactic rule" was announced in Michigan v. Jackson, where the Supreme Court held that once a defendant's Sixth Amendment right to counsel has attached, if a defendant requests the assistance of counsel or "asserts" his right to counsel, then any subsequent waiver obtained pursuant to police-initiated interrogation will be presumed involuntary, regardless of whether the waiver was actually voluntary, knowing and intelligent. 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986). After concluding that the right to counsel under Art. I, Sec. 13 of the Louisiana Constitution was coextensive with the right to counsel under the Sixth Amendment, and based on United States Supreme Court jurisprudence making clear that a defendant can validly waive his Sixth Amendment right to counsel under certain circumstances, we held:
Because our constitution can give no less protection than is afforded by the United States Constitution, we are additionally bound by the Court's holding in Michigan v. Jackson that once defendant's right to counsel has attached, if he makes an assertion or invocation of this right, any waiver he would later make in response to police-initiated interrogation will be considered invalid, regardless of whether the waiver would normally meet the standards of a knowing, intelligent and voluntary waiver. Where defendant's right to counsel has attached but he has not made an assertion or invocation of his right to counsel, a waiver in response to police-initiated interrogation can be considered valid provided it is knowing, intelligent, and voluntary. (Emphasis added.)
664 So.2d at 382-83.
In this case, defendant's right to counsel attached at the 72-hour hearing held on the morning of September 10, 2002, at which time indigent defense counsel was appointed to represent him. While the minute entry clearly shows that counsel was appointed, it does not show a response by defendant. The State alleges that the defendant simply stood mute at this hearing and defendant does not allege that he made any statement at this hearing asserting his right to counsel. As we held in Carter, "[s]omething more than the mere *1261 mute acquiescence in the appointment of counsel is necessary to show the defendant has asserted his right to counsel [to] sufficiently trigger the enhanced protection provided by Michigan v. Jackson's prophylactic rule." Id. at 383. Thus, we find that although his right to counsel had attached, he did not assert his right to counsel such that the prophylactic rule of Michigan v. Jackson would invalidate any waiver he would later make.[68]
Because defendant had not asserted his right to counsel, the only remaining inquiry is whether his Sixth Amendment waiver was knowing, intelligent and voluntary. Id. at 385 ("For the fruits of interrogations occurring after the attachment of the right to counsel . . . to be admissible in the prosecution's case in chief, the State must prove a voluntary, knowing, and intelligent waiver of the right to counsel." (citing Michigan v. Harvey, supra)). There is no dispute that defendant was given his Miranda warnings, and that he signed a waiver of these rights, prior to the September 10 excursion to look for the murder weapon, during which time he wrote the apology letter to Mrs. Ferrari. However, defendant argues that his "waiver" was not a knowing waiver because he was unaware an attorney had been appointed at the 72-hour hearing. Further, he testified at trial as follows:
They asked me if I would come with them to go clear up where I threw the gun at. So I said, Well, and I don't, I don't, I don't really want to go with you. He said, Do you have a lawyer? I said, *1262 yeah, I got a lawyer appointed to me. He said, No, no, you don't. I said, Yeah, I think I got a lawyer appointed to me, and I guess that's where I messed up, when I said I think I got a lawyer appointed to me. He said, No, you don't. He said, I checked, you don't have a lawyer appointed to you.[69]
Detective Hall testified that when he first approached defendant prior to the car ride, he was not aware that he had been appointed counsel earlier that morning and defendant told him he had not been contacted by an attorney. Defendant argues that his waiver could not have been "knowing" since he did not know he had been appointed an attorney.
In Patterson v. Illinois, supra, the Supreme Court validated statements the defendant made to police after he had been indicted for murder, at which time he was entitled to counsel under the Sixth Amendment. There, the Court stated that the key inquiry in such a case must be:
Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?
487 U.S. at 292-93, 108 S.Ct. 2389. The Court then considered that Miranda warnings had been given to the defendant before he made his statement postindictment and held that "the Miranda warnings given petitioner made him aware of his right to have counsel present during the questioning" and "served to make petitioner aware of the consequences of a decision by him to waive his Sixth Amendment rights during postindictment questioning." Id. In Carter, we relied on Patterson in holding that "in the context of the waiver of the right to counsel in an interrogation, Miranda warnings given to a defendant prior to his making a statement will suffice to meet the state's burden of proving the statement was given as a result of a knowing and intelligent waiver of the Sixth Amendment and La. Const. Art. I, Sec. 13 right to counsel." Id. at 386. Here, although defendant, and even the police may not have been aware that defendant had been appointed counsel, the giving of Miranda warnings and his subsequent waiver of those rights was sufficient to apprise him of his right to have counsel present at the interrogation and the consequences of a decision to proceed without the aid of counsel. See Patterson, supra, 487 U.S. at 292, 108 S.Ct. 2389; Carter, supra at 385. Further, at the 72-hour hearing he was told that counsel was being appointed for him. Thus, we find that defendant's waiver was knowing, intelligent, and voluntary, and that the apology letter was properly admitted by the trial court.[70] This assignment of error lacks merit.
Capital Sentence Review
Passion, Prejudice, or Other Arbitrary Factors.
In discharging its duty imposed by the legislature to "review every sentence of death to determine if it is excessive," La. C.Cr.P. art. 905.9, this Court will review the record in a capital case to determine: *1263 (1) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors; (2) whether the evidence supports the jury's finding of a statutory aggravating circumstance; and (3) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. La.S.Ct. Rule 28, § 1. In the present case, Rule 28 review demonstrates that defendant's death sentence is not excessive.
Defendant argues that the death sentence is constitutionally excessive due to the following: the total absence of any presentation of mitigating evidence during the penalty phase of the trial, making meaningful sentence review impossible; the prejudice that resulted from the introduction of graphic autopsy photographs, improper "victim impact evidence" during the guilt phase of the trial, and the arbitrariness created by the trial court's frequent admonitions to speed the proceedings along; and numerous substantial errors occurring at trial. First of all, given that it was defendant's burden to present mitigating evidence, the fact that none was presented will not prevent a death penalty from being imposed.[71] Further, although the crime scene and autopsy photographs were gruesome, their probative value outweighed any prejudicial effect that may have resulted. Regarding the victim's wife testimony at trial, this testimony did not rise to the level of "victim impact evidence" which is generally not admissible during the penalty phase. Finally, there is no merit to the defendant's argument that the trial judge's remarks to speed things along injected an arbitrary factor into the proceedings because the jury could clearly see that the trial judge was proceeding with careful deliberation reflecting the importance of a capital case. Beyond those issues, the record does not show any indicia of passion, prejudice, or arbitrariness. Defendant, a white male, killed a white male victim and received a sentence of death from a jury, during the selection of which no Batson or reverse-Batson claim was raised. Nothing in the record suggests race was an issue in the trial.
Aggravating Circumstances.
As demonstrated by the jury's verdict during the guilt phase of the trial, the state presented sufficient evidence to prove beyond a reasonable doubt that defendant was engaged in the perpetration of an armed robbery and an attempted armed robbery when he killed the victim. A review of the record shows that the evidence was sufficient to support such a determination.
Proportionality.
The federal Constitution does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La.1987), cert. denied, 488 U.S. 871, 109 S.Ct. 180, 102 L.Ed.2d 149 (1988), *1264 although the Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
The Uniform Capital Sentence Report reveals that defendant is a white male born on May 11, 1979. He was 23 years old at the time of the offense and is now 28 years old. He did not graduate from high school, nor did he obtain a GED during his juvenile incarceration in Florida, which began when he was 18 years old and lasted for 6 years. Experts agree that he suffers from anti-social personality disorder but is otherwise free from abnormal mental functioning. Following his release from prison in Florida, he was briefly employed in roofing work until quitting his job to work as a driver for his co-defendant. The extensive list of offenses to which he pled guilty as a juvenile are enumerated in footnote 11 of the unpublished appendix.
Since 1976 there have been 24 successful prosecutions for first degree murder in the 22nd Judicial District Court which comprises the parishes of St. Tammany and Washington. Of these cases, jurors have returned the death penalty nine times, excluding the instant case. However, three of these cases resulted in the annulment of the death penalty and the imposition of a life sentence.[72] In three others, the jury returned armed robbery and heinousness as aggravating factors. The most recent case is that of David Wilson who fatally shot a motorist for gas money. State v. Wilson, 467 So.2d 503 (La.1985), cert. denied, 474 U.S. 911, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985). The federal Fifth Circuit subsequently granted relief on his ineffectiveness claim which resulted in a stipulation, conditioned on the defendant waiving his right to appeal, that he would receive a life sentence. Wilson v. Butler, 825 F.2d 879 (5th Cir.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988). His co-defendant, Larry Taylor, received a life sentence following his conviction for first degree murder. State v. Taylor, 469 So.2d 46 (La.App. 1 Cir. 1985). The next case is that of David Rushing who robbed and killed a cab driver with a shotgun. State v. Rushing, 464 So.2d 268 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2258, 90 L.Ed.2d 703 (1986). His death sentence was later vacated by the federal Fifth Circuit based on the improper introduction of victim impact evidence. He is now serving a life sentence without benefit of parole, probation, or suspension of sentence. Rushing v. Butler, 868 F.2d 800 (5th Cir.1989). Rushing's co-defendant, Jeffrey Fussell, pled guilty and was sentenced to life imprisonment. Rushing, 464 So.2d at 271 n. 2. The third case involves Frederick Kirkpatrick, who robbed and killed an elderly man by striking him in the head with a heavy glass object, implanting a butcher knife into the victim's chest, and shooting him in the head. State v. Kirkpatrick, 443 So.2d 546 (La.1983). The federal Fifth Circuit remanded his case for a hearing based on a Brady violation; the state and defense *1265 subsequently stipulated to a life sentence. Kirkpatrick v. Butler, 870 F.2d 276 (5th Cir.1989), cert. denied, 493 U.S. 1051, 110 S.Ct. 854, 107 L.Ed.2d 848 (1990). His co-defendant was convicted of second degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. State v. Faulkner, 447 So.2d 1139 (La.App. 1 Cir.1984), writ denied, 449 So.2d 1345 (La.1984).
Finally, in one instance, a jury recommended death after finding the sole aggravating circumstance of armed robbery. In that case, co-defendants Roy Clark, Jr. and Brent Mikell, were accused of shooting the victim during an attempted armed robbery. Their death sentences were subsequently set aside and the trial court imposed life sentences. State v. Clark, Jr., 340 So.2d 208 (La.1976).
Although several capital verdicts from St. Tammany and Washington Parishes were ultimately set aside, a review of those cases does not suggest that the defendant received a disproportionately harsh sentence in this case. Further, a state-wide review of cases reflects that jurors often return the death penalty when innocent adult victims have been robbed or raped and murdered in or near their home or car. See State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Tart, 92-0772 (La.2/9/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 799 (1991); State v. Eaton, 524 So.2d 1194 (La.1988), 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989); State v. Wingo, 457 So.2d 1159 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2049, 85 L.Ed.2d 822 (1985); State v. Glass, 455 So.2d 659 (La.1984), cert. denied, 471 U.S. 1080, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985); State v. Celestine, 443 So.2d 1091 (La.1983), cert. denied, 469 U.S. 873, 105 S.Ct. 224, 83 L.Ed.2d 154 (1984); State v. Narcisse, 426 So.2d 118 (La.1983), cert. denied, 464 U.S. 865, 104 S.Ct. 202, 78 L.Ed.2d 176 (1983).
Furthermore, as noted above, at the time of the offense, defendant was 23 years old and we have previously affirmed death verdicts for defendants younger than this. State v. Craig, 95-2499 (La.5/29/97), 699 So.2d 865, cert. denied, 522 U.S. 935, 118 S.Ct. 343, 139 L.Ed.2d 266 (1997); State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); State v. Prejean, 379 So.2d 240 (La.1979), cert. denied, 449 U.S. 891, 101 S.Ct. 253, 66 L.Ed.2d 119 (1980). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. Art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to *1266 represent the defendant in any State post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
NOTES
[1] On February 14, 2005, the district court granted the defense's motion to sever the trials of Montejo and Moore. The defense argued in its motion to sever that joint trial was inappropriate because Moore, during his interrogation by police, incriminated Montejo. Moore was tried separately and convicted as a principal to the second degree murder of Lewis Ferrari. His conviction and sentence of life imprisonment without benefit of probation, parole, or suspension of sentence were affirmed by the court of appeal. State v. Moore, 06-1979 (La.App. 1 Cir. 3/28/07), 953 So.2d 209 (unpub'd).
[2] The state presented two witnesses: a correctional officer who was struck by Montejo at the St. Tammany Parish jail, and the victim's adult daughter. The defense presented Montejo's father and mother.
[3] In this motion, the defense argued concerns that now form the basis of assignments of error 3 (admission of the police report), 10 (denial of the motion to continue), 1 (admission of the confession made after invocation of right to counsel), and 2 (admission of the handwritten statement) in the instant appeal.
[4] She also said that Moore started asking the victim for small loans.
[5] The defense twice objected to Morrow reporting what she heard the victim said to Moore, the objections were sustained, and these statements are among the testimony involved in the defendant's 11th assignment of error.
[6] Dillard had observed them arguing before but never this vehemently. However, he was unable to overhear the contents of the argument.
[7] Neighbor Larry Landry also noticed the van in the neighborhood at around 10 or 11 a.m. on the day before the murder.
[8] Dr. Difatta designated the superficial wound as "A" and the fatal wound as "B." The bullet that caused wound "A" entered the victim's right lateral chest and exited his right back without perforating his chest cavity. Searing and soot deposits indicated that this shot was fired from within 12 inches. The bullet that caused wound "B" was fired directly into the victim's right eye, which it destroyed before inflicting lethal damage to his brain and exiting the back of his skull. The lack of searing or stippling indicated that this shot was fired from no closer than 36-43" away. Dr. Difatta testified that nothing necessarily precluded shot "A" from following shot "B", but the victim would have fallen to the floor immediately after shot "B."
[9] These crime scene and autopsy photographs depicted the following: blood spatter on the ceiling in the kitchen and on the dishwasher; bone fragment on the tile floor and kitchen area; the right area and top part of the victim's chest showing where he was shot; the chest area showing the direction through the chest where the victim was shot; the left eye where the victim was shot; the wound on the back part of the victim's head; the head area showing the direction through the head that the victim was shot, front to back.
[10] The victim owned Fiocchi .357 caliber Magnum semi-jacketed hollow points. The sample ammunition was provided by the victim's widow.
[11] This fingerprint was recovered from the interior front door. It did not match Montejo, Moore, or Gai, and AFIS returned no matches for it. It was never compared to the victim's family, friends, or neighbors.
[12] This bullet was whole, in good condition, and likely passed through the victim's side. In addition to the victim, this bullet passed through a potato chip bag.
[13] The defense objected at this point on the basis that the witness had not been qualified as an expert but the district court permitted Downing to provide lay opinion testimony about blood spatter as an employee of the crime lab. This ruling underlies the instant application's 12th assignment of error and is discussed in greater detail in the unpublished appendix. Hall, the signing of the 8:45 a.m. and noon waivers were followed by brief discussions in which detectives sought information on the location of the murder weapon and the victim's money.
[14] The receipts were in the pocket of a shirt pocket lying on the driver's seat. The money was inside a wallet on the console. These items as well as stereo equipment and a cell phone from inside the van were admitted without objection.
[15] The gloves were admitted without objection. The gloves were not tested for gunshot residue. The crime lab does not test for gunshot residue because it considers the test to be unreliable.
[16] Montejo was interviewed from about 4:30 p.m. until about 11 p.m. on September 6, 2002, and again between approximately 3 and 4 a.m. on September 7, 2002. About four hours of the interrogation were videotaped.
[17] This motion included all "confessions and other inculpatory statements" whether "oral or written" that were "obtained from defendant by all law enforcement officers or other agents of the State. . . ."
[18] Detective Morse was lead case officer in this investigation.
[19] Detective Major also encountered Montejo at the Gretna Police station but was not involved in transporting him back to St. Tammany. Montejo testified at trial that he asked detectives in Gretna if he could have a lawyer present but they told him they would not recommend that.
[20] The exhibits include seven written rights form and waivers signed by the defendant (in chronological order): September 6 at 4:38 p.m. and at 10:02 p.m.; September 7 at 3:45 a.m.; September 9 (but see below) at 8:45 a.m., noon, and 2:45 p.m., and September 10 at 3:40 p.m. The interrogation began on September 6 after the defendant waived his rights at 4:38 p.m. The videotape stopped after he invoked his right to counsel, but began again when he waived his rights at 10:02 p.m. and the interrogation resumed. His final videotaped confession was obtained after he waived his rights at 3:45 a.m. on September 7. The excursion with police occurred after he waived his rights on September 10. It appears that the September 9 waivers were dated incorrectly by mistake and in fact occurred on September 10. According to Detective
[21] Captain David Hall also appears intermittently during the videotaped interrogation but was not called to testify at the suppression hearings. Detective Jerry Hall was involved in the final confession that was videotaped between 3 and 4 a.m. on September 7.
[22] Their testimony at the suppression hearings was consistent with their later testimony at trial.
[23] About three minutes after the video starts (at 0:02:54), Montejo checks his watch and comments that it is 7 p.m.
[24] He is provided with a shirt after his clothing is seized pursuant to a warrant. On the remainder of the video, he wears the shirt detectives gave him. However, he comments, during the collection of physical evidence, that he normally does not wear a shirt. Detective Major testified at trial that there was a space heater running in the room and Montejo did not complain that he was cold or request clothing.
[25] He smoked one cigarette at the beginning of this tape. The detectives gave him another about 40 minutes later. At about 1:15:15, he requested and received another cigarette. They later give him another cigarette, which he did not request.
[26] Montejo initially denied entering the victim's home. When confronted with the possibility that his DNA might be found inside the home, he admitted that he was there previously but denied entering the home of the day of the murder. After the detectives falsely claim that forensic analysis can determine when he was in the home (at about 0:02:25), Montejo admitted that he entered the home and proceeded to relate his second version of the crime. Both detectives conceded at trial that they misled Montejo about forensic science. According to one commentator, at least one popular interrogation training manual recommends this tactic:

The authors recommend a panoply of interrogation techniques, including the use of a false evidence ploy to produce a confession. Making reference to the "average person['s] . . . mystical notions of the power of scientific crime detection," the O'Hara & O'Hara Manual suggests that such persons "will accept practically any claims that science may make."
Miriam S. Gohara, A Lie for a Lie: False Confessions and the Case for Reconsidering the Legality of Deceptive Interrogation Techniques, 33 Fordham Urb. L.J. 791, 813 (2006). That commentator also reports that the presentation of false evidence has been empirically shown to be "a highly effective method of eliciting self-incriminating information." Id. at 819. Finally, that commentator notes that such tactics are generally acceptable to the courts:
Few federal courts have circumscribed the use of specific deceptive interrogation techniques, and only in rare cases have federal courts deemed deceptive interrogation practices coercive. . . . Interrogations employing false or fabricated evidence where interrogators have misled suspects to believe that police possessed inculpatory evidence, including physical evidence or accomplices' confessions, have generally been held to be voluntary.
Id. at pp. 805-06.
[27] In the context of explaining why he wouldn't stay while Moore ransacked the home, Montejo refers to his prior incarceration. This is one of the eight remarks underlying the defendant's seventh assignment of error.
[28] In this latter portion, the detectives again mislead Montejo as to the capabilities of forensic science. The detectives also left Montejo to sit alone for about nine minutes during this portion of the interrogation. In the context of discussing cooperating with the police, Montejo refers to his prior incarceration three times, one of the detectives refers to Montejo's prior incarceration once, and Montejo also implies that he has been interviewed by detectives in the past. These are five of the eight remarks underlying the defendant's seventh assignment of error.
[29] While discussing the murder weapon, the detectives again exaggerate the capabilities of forensic science.
[30] After physical evidence is collected pursuant to a warrant (including fingernails, hair, blood, clothing, and photographs), the detectives tell Montejo that they know he, and not Moore, was the shooter because of the forensic evidence. Detective Major testified at trial that they did not have the DNA evidence at this time but claimed they did to encourage him to confess.
[31] This is Captain David Hall and not Captain Jerry Hall. Captain Jerry Hall testified at the hearings on the motion to suppress; Captain David Hall did not. To distinguish the two, Captain Jerry Hall is often referred to as Detective Hall in this opinion.
[32] The identities of the detectives in the video can reasonably be inferred from their testimony at the suppression hearing regarding who informed Montejo that he was under arrest and the order in which they left the room.
[33] Montejo testified at trial that he became frightened when he heard that he was under arrest for first degree murder.
[34] Montejo testified at trial that Detective Morse returned to the room and offered him one more chance to save his life, save Gai, and express remorse on video so that a jury wouldn't sentence him to die.
[35] Montejo initially appeared tearful and, at about 0:02:06, lowered his head and said "What am I doing?"
[36] During this rendition of the crime, Montejo refers to his prior six-year-long incarceration as a juvenile. This is another of the eight statements underlying the defendant's seventh assignment of error.
[37] During this statement, Montejo comments once that he stole cars as a juvenile and that he had just been released from prison. The is the last of the eight remarks underlying the defendant's seventh assignment of error.
[38] Moore said he couldn't burglarize the house himself because he would be recognized in the neighborhood.
[39] Aside from additional details, the primary differences between this and the earlier version were that Montejo now claimed that the victim, rather than Moore, first introduced him to D.P., and he no longer conspired from the beginning to commit burglary with D.P. but rather was surprised by D.P.'s unilateral criminal acts. A family friend, Mary Melancon, also testified at trial that Montejo told her the same story when she visited him in jail. told him that he was mistaken. During this excursion, Montejo also produced a brief handwritten statement to explain that he was accompanying detectives voluntarily and gave the following reason for assisting the detectives: "At first I wasn't truthful out of being scared but now I see cooperation makes me feel 100% better." This statement was admitted into evidence during the testimony of Detective Hall. As noted previously, there was some confusion as to whether this excursion occurred on September 9 or 10, but it was eventually resolved and the correct date determined to be September 10.
[40] Montejo speculated that this is how his neck was scratched by the victim.
[41] According to Montejo, the victim said he had $2500 in a money bag but D.P. was dissatisfied with that amount and demanded more.
[42] Montejo said he tried to decline the victim's car keys but the victim encouraged him to take them and leave.
[43] However, the next day, Montejo did tell Moore what had happened. By the time of trial, Montejo said that his family had since moved and was now safe from D.P.
[44] Montejo created some confusion as to where he disposed of the murder weapon and, in fact, this weapon was never recovered (although divers conducted a grid search of over 100,000 square feet). At some point, Gai told police that he thought Montejo threw the gun over the levee where they left the victim's car but Montejo denied this claim. In his final videotaped statement, Montejo recalled that he threw the murder weapon off the Highway 11 bridge as he was returning from the westbank and realized that he previously told detectives to search on the wrong side of the highway bridge. After making his final videotaped statement, Montejo went with Detective Major in the early morning on September 7 to show him where on Highway 11 he threw the weapon off the bridge. That, however, is not the excursion during which Montejo wrote a letter of apology to the victim's widow (at issue in the defendant's second assignment of error) which occurred on September 10.
[45] Montejo claimed at one point that he burned the victim's money bag. During the excursion on September 10, he pointed out a dumpster at a gas station where he said he threw the money bag. However, detectives found that the trash had already been collected from this dumpster.
[46] In fact, Detective Hall testified that, at some point during this excursion, he asked Montejo whether he had a lawyer or anyone in his family had contacted him about retaining one for him, and Montejo responded negatively. Detective Hall was confronted by indigent defense counsel when he returned Montejo to jail.
[47] Montejo testified at trial that Detective Hall asked him if a lawyer had been appointed for him, and when he responded affirmatively,
[48] Montejo uses the phrase "simple burglary" in his handwritten letter. The defense construes this as a legal term of art and, based on that construction, argued at trial that the letter must have been dictated by a person who was familiar with the statutory forms of burglary, such as a law enforcement professional.
[49] This two-page letter reads as follows (with spelling and punctuation unaltered but capitalization normalized for legibility):

Ms. Ferrari,
This is very hard to put in the right words but I will try hard. My soul is feeling you very much. If I could rwind time I wish that bullet would of hit me. Please finish reading. I really want you to know I had no intention on his death and I am in a log of true pain I'm so sorry I can picture your heart dropping at sight it is eating me up inside so bad. I try to talk to Loue every day to say I'm sorry and wish I could let you feel my emotion to know truely how sorry and how bad this is tearing me up. I promise you I didn't cold blood kill Mr. Loue if I could change places I would be dead. Please be strong only God really knows why this happen you a beautiful woman and I'm huting more than you would really expect to know I caused that I did crimes before but I'm really not as harmful as what happen please forgive me Ms. Ferrari I prey for you to be strong and get through I will prey every day I'm accepting God for once in my life and begging for forgiveness I'm so sorry please forgive me I was going for a simple burgulary in and out that someone put me on and instead I found the gun so I thought if some reason some one does come in I can scare with the gun and run but he wasn't scared I swear I tried to just run Ms. Fearri but he wouldn't let me I even fired a warning which skint him on the side but he still kept coming strong I couldn't see then the shot and he flew back I ran with no ride I grabed his keys I almost shot myself the gun was cocked back agin and I didn't know how thats how scared I was so I shot into the couch I know you needed to know this Ms. Ferri and may God make you strong please I need your forgiveness Ms. Ferri I'm more than sorry for what happen please forgive me please I'm sorry I lost my life too, my baby my beautiful girl I'm so sorry.
[signature]
Please forgive me Miss. Ferri may God be with you and make you strong because hes killing me inside.
9-10-02
8:30 p.m.
The defendant testified at trial that he was prompted to write this letter by detectives and that much of its contents were suggested by Detective Galloway, who accompanied Detective Hall and Montejo on September 10, but did not testify at trial.
[50] Among other things, the defense claimed that the detectives coerced Montejo by suggesting that, if he continued to speak with them, he might be convicted only of manslaughter (rather than murder), and that he could protect his younger stepbrother, Eric Gai. Although Detective Morse conceded that another detective might have explained the statutory definitions of manslaughter and murder to Montejo at some point during the interrogation, he did not do so. Detective Major admitted that he discussed manslaughter and murder with Montejo as an interrogation technique but denied that he said that if Montejo cooperated he would only be charged with manslaughter. Detective Morse denied discussing Gai when Montejo invoked his right to counsel.
[51] The Supreme Court has commented that "[f]irst the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). If it is found that the interrogation continued beyond the request for counsel, a defendant's act in reinitiating communication might be attributable to the circumstances of the interrogation rather than the defendant's volition. Likewise, if it is found that a request for counsel was not scrupulously honored, then a defendant has no reason to believe his revocation will be given greater effect than his original demand received. As noted by the Supreme Court in Smith, "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." Smith v. Illinois, 469 U.S. 91, 99, 105 S.Ct. 490, 494, 83 L.Ed.2d 488 (1984) (quoting the dissenting judge in the decision of the state court below). Nor should the state be shielded by a defendant's revocation of a request it did not scrupulously honor. As emphasized by the dissent in Olmstead v. United States:

Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously.
Olmstead, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting).
[52] The dissent (joined by three justices) defined "initiate" more narrowly to include only statements "about the subject matter of the criminal investigation." Bradshaw, 462 U.S. at 1053, 103 S.Ct. at 2839 (Marshall, J., dissenting, joined by Brennan, Blackmun, and Stevens, JJ.).
[53] This ellipsis is placed here to indicate when Detective Morse informed the defendant that he was under arrest.
[54] See Bradshaw, 462 U.S. at 1045-46, 103 S.Ct. 2830 ("[a]lthough ambiguous, the respondent's question in this case to what is going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship").
[55] See U.S. v. Glover, 1999 WL 79620 *9 (D.Kan.) (unpub'd), in which the defendant commented "You and Chuck are nice. Those other guys are assholes. All they did was yell." The Glover court rejected the state's contention that those statements constituted an "initiation":

We find Mr. Glover's remarks, when viewed in the context of the entire conversation in Detective Heinrich's car, were nothing more than his reflections about the way the interrogation was conducted, i.e., the procedures surrounding the interview. As such, his utterances were more akin to "statements relating to routine incidents of the custodial relationship." Viewed in their proper context, Mr. Glover's statements simply cannot reasonably be construed as evincing a willingness and a desire for generalized discussion about the substances of the investigation.
Id. Nor does the defendant's statement in the instant case appear to be comparable to "soliciting advice about his predicament", which one court characterized as "inviting discussion of about the crime of which he was charged." See Vann v. Small, 187 F.3d 650 (9th Cir. 1999 (Cal.)) (unpub'd). The instant defendant's statement certainly less clearly evinces a willingness and a desire for a generalized discussion about the investigation than repeating that "he had to tell somebody." See Shedelbower v. Estelle, 885 F.2d 570, 573 (9th Cir. 1989)
[56] See Innis, 446 U.S. at 302-03, 100 S.Ct. 1682; see also Shedelbower, supra at 573 ("Since the officer's comments to Shedelbower were not in the form of express questions, they do not constitute interrogation in the normal sense of the word. Rather, we must determine whether it was interrogation in the sense described in Innis, where the statements were expected to elicit an incriminating response."); Vann v. Small, supra ("Other facts suggest that the remark was not `interrogation.' It did not involve an express question . . . ").
[57] See Innis, 446 U.S. at 302, 100 S.Ct. 1682; see also Vann v. Small, supra (commenting that the detective's comments were not "particularly evocative" but instead were "rather vacuous").
[58] Rhode Island v. Innis, supra.
[59] Cf. U.S. v. Montgomery, 714 F.2d 201, 203-04 (1st Cir.1983) (suggesting that the defendant was goaded into further questioning, which lead to his making incriminating statements, by the detective's deliberately unresponsive answer to the defendant's question).
[60] One court expressly found this factor significant:

We must consider, however, whether the fact that the police spoke first after Shedelbower had stated that he wanted to call an attorney vitiates Shedelbower's express request for a further discussion. The remarks of the police were not an invitation to further discuss the matter. In fact, the police refused to do so until they spoke to the district attorney and returned and gave a further Miranda warning to assure that Shedelbower really wanted to discuss the matter without the presence of an attorney.
Shedelbower v. Estelle, 885 F.2d 570, 573 (9th Cir.1989). Shedelbower involved a similar scenario to the instant case in which, when an initially cooperative defendant invoked his right to counsel, detectives stood, informed the defendant that he was under arrest, after which the defendant revoked his request for counsel. See Shedelbower, 885 F.2d at 572. The immediate withdrawal by a suspect during an interrogation of his request for counsel appears to be not wholly uncommon. See, e.g., People v. Childers, 94 Ill.App.3d 104, 49 Ill.Dec. 939, 418 N.E.2d 959, 964 (1981).
[61] Edwards v. Arizona, supra, 451 U.S. at 484-485, 101 S.Ct. 1880; Miranda v. Arizona, supra, 384 U.S. at 440-445, 86 S.Ct. 1602.
[62] Miranda, supra, 384 U.S. at 475, 86 S.Ct. 1602 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.").
[63] One commentator contends that the length of the interrogation is a factor to be considered when determining the voluntariness of the interrogation because empirical studies have shown that, while most interrogations are brief, those that are known to have produced false confessions are much longer:

A fourth issue concerns the amount of time suspects spend in the interrogation room, a factor of relevance to evaluating the voluntariness of the statements that are made. Observational studies have suggested that routine interrogations tend to be relatively brief encounters, with the modal duration ranging from 20 minutes to an hour. These findings stand in stark contrast to Drizen and Leo's archival study of 125 proven false confessions, where 34% of interrogations lasted 6 to 12 hours, 39% lasted 12 to 24 hours, and the mean was 16.3 hours. This latter finding is not surprising in light of prominent case studies of false confessions, so many of which were taken at night and after lengthy interrogations.
Saul M. Kassin et al., Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs, 31 Law & Hum. Behav. 381 (2007) (citations omitted). The length of the interrogation in the instant case is sufficient to cause concern although not so long as to place it squarely in the realm of interrogations known to have produced false confessions.
[64] Detectives concede that their interrogation methods included initially minimizing the defendant's role in the crime, and the defendant complains that, at some point, the differences between manslaughter and murder were discussed. However, in Colorado v. Spring, supra, 479 U.S. at 577, 107 S.Ct. 851, the Supreme Court noted that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Cf. State v. Williams, 521 So.2d 629, 630-631 (La.App. 1 Cir. 1988) (voluntariness of defendant's statements was not affected by alleged fact that he thought he was under arrest for shooting of police dog and that he had no intent to make a statement concerning charge of attempted first degree murder of a police officer).
[65] As the Supreme Court has noted, the focus of the voluntariness inquiry is whether "a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. . . . [and most critically] that whatever he chooses to say may be used as evidence against him." Spring, 479 U.S. at 574, 107 S.Ct. 851. The instant defendant clearly demonstrated this understanding.
[66] This Court opened the door to revisit Hattaway at a later date by stating in State v. Carter that "[w]e need not decide today however, whether we were correct in Hattaway that an initial appearance under La.C.Cr.P. art. 230.1 marks the `initiation of adversary judicial criminal proceedings.'" Carter, 644 So.2d at 373. However, this statement of law was not discussed further or overruled. Although Hattaway has been refined by State v. Carter, supra, it remains good law in the respect that the accused's right to counsel under the Sixth Amendment and La. Const. art. I, § 13 attaches no later than his first appearance before the committing magistrate.
[67] The "covert" interrogation cases upon which the Hattaway opinion was based include Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); McLeod v. Ohio, 381 U.S. 356, 85 S.Ct. 1556, 14 L.Ed.2d 682 (1965) (per curiam); Beatty v. United States, 389 U.S. 45, 88 S.Ct. 234, 19 L.Ed.2d 48 (1967) (per curiam); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); and Maine v. Moulton, 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). See also Kuhlmann v. Wilson, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986).
[68] See also Montoya v. Collins, 955 F.2d 279 (5th Cir.1992), reh. denied, 959 F.2d 969, cert. denied, 506 U.S. 1036, 113 S.Ct. 820, 121 L.Ed.2d 692 (1992), where the Fifth Circuit held that not every appointment of counsel by a committing magistrate to protect the accused's interests constitutes a request for, or an assertion of, the right to counsel for purposes of Michigan v. Jackson. According to the police officer who attended the defendant's first appearance before the magistrate on a charge of murder, the defendant made no response when informed that the judge would appoint an attorney for him. Montoyo, 955 F.2d at 282-83. On direct review, the Texas Court of Criminal Appeals found that the defendant had not invoked his right to counsel for purposes of Jackson, although the magistrate in fact appointed counsel for him, on the basis of a statement by the magistrate "`that he decided to appoint counsel to represent appellant because the appellant was charged with capital murder, not because the appellant requested the assistance of counsel.'" Id., 955 F.2d at 282 (citation omitted). In affirming the district court's denial of federal habeas corpus relief, the Fifth Circuit observed that:

The rule of Jackson is invoked by the defendant's `assertion . . . of the right to counsel.' This language connotes an actual, positive statement or affirmation of the right to counsel. At no time did Montoya make such a statement or affirmation  as the state court found, he did not request counsel, and he said nothing at all when the magistrate appointed counsel for him. We do not say that by his silence Montoya "waived any of his rights, for at any time subsequent to his appearance before the magistrate, including during his interrogation, Montoya could have asked to see a lawyer and Jackson would have barred any further police-initiated interrogation. Rather, Montoya never asserted, or invoked, his right to counsel in the first place. . . . For purposes of Jackson, an `assertion' means some kind of positive statement or other action that informs a reasonable person of the defendant's `desire to deal with the police only through counsel.' This holding does not require a defendant to utter the magic words, `I want a lawyer,' in order to assert his right to counsel. As Montoya points out, the Supreme Court `give[s] a broad, rather than a narrow, interpretation, to a defendant's request for counsel.' Connecticut v. Barrett, 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987). But interpretation, whether broad or narrow, is only required when there is a `request' or an `assertion' in the first place."
Id., 955 F.2d at 283.
[69] Even if defendant's statement is true and the police did tell defendant he did not have a lawyer, this does not rise to the level of the facts presented in Moran v. Burbine, supra. In that case, the United States Supreme Court permitted a Miranda waiver to stand under the Sixth Amendment where a suspect was not told that his lawyer was trying to reach him during questioning and the lawyer was told by police that the defendant would not be questioned without the lawyer's presence.
[70] The defendant does not argue that the waiver was not voluntary.
[71] Defendant is not alleging an ineffective assistance of counsel claim at this time. Thus, cases finding that failure to present mitigating evidence constitutes ineffective assistance of counsel in a capital case are inapplicable. See Williams v. Taylor, 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005).
[72] See State v. Hart, 96-0697 (La.3/7/97), 691 So.2d 651 (first degree murder conviction and death sentence set aside with instructions for trial court to enter judgment of second degree murder and sentence of life imprisonment); State v. Willie, 360 So.2d 813 (La. 1978) (first degree murder conviction affirmed, death sentence vacated and remanded for imposition of life sentence); State v. Clark, Jr., 340 So.2d 208 (La.1976), cert. denied, 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977) (first degree murder convictions affirmed, death sentences annulled and remanded for imposition of life sentences).